In re Frank **ALBANO** and Jacqueline Albano, Debtors.

**CRAIG CORP.** and Monitor Crystal Services, Inc., Appellants,

v.

Frank **ALBANO** and Jacqueline Albano, Appellees.

**Bankruptcy No. 84 B 6242. No. 85 C 5984.**

United States District Court, N.D. Illinois, E.D.

Nov. 7, 1985.

Richard J. Hollander, Hollander & Hollander, Chicago, Ill., for appellants.

Phillip D. Levey, Chicago, Ill., for appellees.

MEMORANDUM OPINION
AND ORDER

SHADUR, District Judge.

Craig Corp. ("Craig") and Monitor Crystal Services, Inc. ("Monitor") appeal from

the May 10, 1985 order of Bankruptcy Judge Edward B. Toles (the "Order") denying their motion to dismiss the voluntary joint petition (the "Petition") of Frank Albano and his wife Jacqueline (collectively "Albanos") under Chapter 13 of the Bankruptcy Reform Act of 1978 (the "Code"), 11 U.S.C. §§ 1301–1330.[1] On appeal Craig and Monitor renew their argument, implicitly rejected by Judge Toles,[2] that Albanos' noncontingent, liquidated, unsecured debts exceed the $100,000 ceiling imposed by Section 109(e) for eligibility to file a Chapter 13 petition. For the reasons stated in this memorandum opinion and order, Judge Toles' Order is reversed and Albanos' Petition is dismissed.

## Facts

Albanos filed their Petition May 14, 1984. On June 19 Albanos filed a "Chapter 13 Statement" form (the "Statement")[3] identifying Albanos' outstanding secured and unsecured debts. Three unsecured debts were listed (Statement 6):

1. Craig Corporation ($85,000)
2. Monitor Crystal Services ($17,000)
3. Fujitsu Ten Corp. of America ($4,000).

Under the Statement's column headed "If disputed, amount admitted by debtor," "–0–" was listed next to each creditor's name. Thus the total unsecured and undisputed indebtedness listed by Albanos was zero.[4]

Albanos were in the car stereo business. At various times before filing the Petition they controlled three corporations (collectively "Corporations"): Custom Car Stereo, Inc. ("CCS"), Custom Car Stereo Distributors of Illinois, Inc. ("CCSD") and Custom Car Stereo of Oak Lawn, Inc. ("CCSOL").[5] All unsecured debts listed on the Petition were contracted not by Albanos personally but by one or more of Corporations.

On February 9, 1984—more than two months before the Petition was filed—Judge Hart of this District Court entered judgment on an $85,141.03 jury verdict against Albanos personally in *Craig Corp. v. Custom Car Stereo, Inc.*, No. 81 C 5087 (N.D.Ill. Feb. 9, 1984) (unpublished order) (*"Craig I"*). In an unpublished March 28, 1984 order the court added $1,856.00 in costs. On appeal the judgment was affirmed, *Craig Corp. v. Albano*, 767 F.2d 924 (7th Cir.1985) (unpublished order) (*"Craig II"*).

On October 12, 1982—more than 19 months before the Petition was filed—a $17,205.80[6] default judgment was entered against Corporations in favor of Monitor. *Monitor Crystal Services, Inc. v. Custom Car Stereo, Inc.*, No. 81 L 24956 (Cir.Ct. of Cook County, Ill. Oct. 12, 1982) (unpublished order). Nothing in the record reflects any attempt by Corporations or Albanos to vacate that default judgment.[7]

In summary, as of the date the Petition was filed, the debt to Craig was in fact an $86,997.03 personal judgment against Albanos previously entered by this District Court. However, the debt to Monitor was

---

1. Citations to individual sections of the Code will follow Title 11's numbering and take the form "Section—."

2. In fact the unpublished Order did not address Craig's and Monitor's argument in terms. It simply denied their motion to dismiss.

3. Though filed with the Clerk of the Bankruptcy Court June 19, the Statement was dated May 31 by its preparer.

4. Secured indebtedness of $338,000 was reflected in the Statement, but that is not at issue on this appeal.

5. There is no discussion of Albanos' business history in the briefs (both sides to the appeal have rested on their briefs filed in the Bankruptcy Court) or in Judge Toles' Order. Instead the facts stated here are drawn largely from the unpublished order in *Clarion Corps. of America v. Albano*, 698 F.2d 1227 slip op. at 2 (7th Cir.1982), attached as an exhibit to the Craig-Monitor brief.

6. Craig-Monitor Mem. 5 and Reply Mem. 1 contain a typographical error, stating the amount as $17,205.88.

7. Under Illinois law a motion to set aside a default judgment must be filed within 30 days of entry of the judgment, Ill.Rev.Stat. ch. 110, § 2–1301(e), while a petition for relief from a final judgment must be filed within two years, *id.* § 2–1401(c).

a $17,205.80 judgment against Corporations previously entered by the Circuit Court. Those two debts aggregated more than $100,000.[8]

### Statutory Framework

Section 109(e) provides:

Only an individual with regular income ... and such individual's spouse ... that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $100,000 ... may be a debtor under chapter 13 of this title.

Its purpose is to limit the availability of a Chapter 13 adjustment of debts to individual wage earners and "small sole proprietor[s], for whom a chapter 11 reorganization is too cumbersome a procedure." H.R. Rep. No. 595, 95th Cong., 1st Sess. 319–20, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6276–77. Congress intended individuals or businesses whose "noncontingent, liquidated, unsecured debts" exceed $100,000 should not have the benefit of the "simpler, speedier and less expensive" Chapter 13 procedure. *Comprehensive Accounting Corp. v. Pearson*, 773 F.2d 751, 753 (6th Cir. Oct. 9, 1985); 2 *Collier on Bankruptcy* ¶ 109.05 (15th ed. 1985). Nor are the Chapter 13 advantages purely procedural, for the new remedy was viewed by Congress as giving the debtor both greater asset protection and far better protection of credit standing than the other alternative of straight bankruptcy. H.R. Rep. No. 595 at 118, 1978 U.S.Code Cong. & Ad.News at 6079.

What is now at issue is whether Albanos' debts to Craig and Monitor are both "noncontingent" and "liquidated." If so, their total of $104,202.03 exceeds the Section 109(e) ceiling and Albanos are not eligible for Chapter 13 relief.

Neither "noncontingent" nor "liquidated" is defined in the Code. Section 101(11) does define "debt" as "liability on a

claim," and Section 101(4)(A) defines "claim" in part as a:

right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed [or] undisputed....

Thus despite the absence of Code definitions, it appears at the very least that "liquidated," "contingent" and "disputed"[9] refer to distinct concepts. *Sylvester v. Dow Jones & Co. (In re Sylvester)*, 19 B.R. 671, 672–73 (Bankr. 9th Cir.1982). That is not to say they must be mutually exclusive, but at least each would appear to have different connotations, even though they might well represent overlapping sets (in the mathematical sense).

Section 109(e) is not the only Code provision that refers to "liquidated" or "contingent" debts. Section 303(b)(1) determines the right of creditors to file a petition for involuntary bankruptcy of a debtor. One or another form of that provision has been in existence since the Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, 561 (the "Bankruptcy Act"), which read:

§ 59(b) Three or more creditors who have provable claims against any person which amount in the aggregate ... to five hundred dollars or over ... may file a petition.

In 1938 the section was amended to read (Pub.L. 696, 52 Stat. 839, 868) (emphasis added):

Three or more creditors who have provable claims *fixed as to liability* and *liquidated as to amount* against any person....

In 1952 the provision was again amended (Pub.L. 456, 66 Stat. 420, 425) (emphasis added):

Three or more creditors who have provable claims *liquidated as to amount* and *not contingent as to liability* against any person....

**8.** It is unnecessary to consider the $4,000 debt to the Fujitsu Ten Corp. of America, not at issue on this appeal.

**9.** For the sake of simplicity this opinion will use the positive form of each term unless the negative form is required.

In 1962 the provision was once more amended (Pub.L. No. 87–681, 76 Stat. 570, 571) (emphasis added):

> Three or more creditors who have provable claims *not contingent as to liability,* amounting in the aggregate to $500 ... may file a petition ... but the claim or claims, *if unliquidated, shall not be counted in computing the number and aggregate amount of the claims ... if the court determines that the claim or claims cannot be readily determined or estimated to be sufficient ... to aggregate $500....*

Then under the 1978 Code's new Section 303(b)(1), involuntary petitions could be filed (Pub.L. No. 95–598, 92 Stat. 2549, 2559) (emphasis added):

> by three or more entities, each of which is either a holder of a claim against such person that is *not contingent as to liability* ... if such claims aggregate at least $5,000....

Finally the provision was amended in 1984 to permit filing (Pub.L. No. 98–353, 98 Stat. 333, 369) (emphasis added):

> by three or more entities, each of which is either a holder of a claim against such person that is *not contingent as to liability or the subject on* [sic—should be "of"] *a bona fide dispute* ... if such claims aggregate at least $5,000....

■ That historical statutory development makes plain that, since at least 1938, bankruptcy parlance has connected the concept of contingency with the notion of liability vel non and the concept of liquidation with the notion of reduction to an ascertainable dollar amount. In addition, the 1984 amendment also shows—as Section 101(4)(A) had already reflected—a contingent debt is not the same thing as a disputed debt, though both contingency and dispute are related to the existence of ultimate liability. Even before the 1984 amendment courts had held, under Section 303(b)(1), a bona fide dispute over liability did not make a claim "contingent." *In re Dill,* 731 F.2d 629, 631 (9th Cir.1984), citing and quoting with approval *In re All Media Properties,* 5 B.R. 126, 133 (Bankr.S.D.Tex.

1980), *aff'd per curiam,* 646 F.2d 193 (5th Cir.1981) (adopting the bankruptcy judge's opinion).

What complicates matters facing courts construing Sections 109(e) and 303(b) is that though each of "contingent," "liquidated," and "disputed" might conceivably be defined in such a way as to appear to exclude the other two, the three concepts at times overlap. *In re Lambert,* 43 B.R. 913, 920 (Bankr.D.Utah 1984). For example *In re Blehm,* 33 B.R. 678, 679 (Bankr.D.Colo.1983) defined "contingent" debts as:

> those claims which depend either as to their existence or their amount on some future event which may not occur at all or may not occur until some uncertain time.

Guaranties are paradigmatic examples of such debts, for the guarantor has no liability unless and until the principal defaults. *Id.* But it could be said without torturing the language that liability to pay *any* disputed debt does not arise unless and until a court enters a judgment ordering payment. Cf. *DeKalb Bank v. Flaherty (In re Flaherty),* 10 B.R. 118, 119 (Bankr.N.D.Ill.1981) (guarantor's liability no longer contingent when principal defaults; liability not "contingent" on results of legal action against guarantor).

One useful conceptual distinction between contingent debts and disputed debts lies in the difference between conditions precedent and subsequent:

> 1. Contingent debts (in the sense of dependency on a future event) involve no liability unless the condition precedent (e.g., a default by a principal) occurs.
>
> 2. Disputed debts involve presumptive liability unless cut off by a condition subsequent (entry of judgment for the debtor).

In those terms liability on a guaranty is "contingent" only until default, rather than the "contingent" status continuing until entry of judgment (although the guarantor may never have to pay if he wins a lawsuit). *DeKalb Bank, id.; In re Wilson,* 9 B.R. 723, 725–26 (Bankr.E.D.N.Y.1981). By the same token, liability on a contract is

non-"contingent" once the contract is made, although that liability is subject to being avoided by some later occurrence. *All Media Properties*, 5 B.R. at 133 ("Subsequent events might lead to a dispute as to liability because of, for example, defective merchandise, but that would merely serve to render the debt a disputed one but would not make it a contingent one").

"Contingent" liabilities therefore seem to be a class of liabilities in which the obligation to pay does not arise until the occurrence of a "triggering event or occurrence ... reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred." *All Media Properties, id.* [10] By definition the default of a principal is foreseeable by the guarantor, for foreseeability of that event is the very basis for the guaranty. Again by definition the parties know in advance the guarantor will become liable only if the contingency of default comes to pass.

All this however does not deal with the notion of certainty in Benjamin Franklin's aphoristic sense that "in this world nothing is certain but death and taxes." Parties to a contract may (if they think about it) understand there might be a dispute between them down the road, but ordinarily they do not contemplate when they put pen to paper that their obligations to perform are contingent on the outcome of a lawsuit. Put another way, contingency goes to the nature of the obligation undertaken, not to the uncertainty of result that permeates all real-world enterprises.

It is frequently said liability arising from commission of a tort is contingent because it is never known whether a tortfeasor will be held liable until judgment is handed down. See, e.g., *Blehm*, 33 B.R. at 679–80. But here the distinction between the concept of contingency and liquidation has tended to blur, for while the existence vel non of tort liability is a matter of speculation until the verdict is in, so is the amount of recovery. Courts have thus held tort or quantum meruit claims to be unliquidated and "therefore" contingent. See *Denham v. Shellman Grain Elevator, Inc. (In re Denham)*, 444 F.2d 1376, 1380 (5th Cir. 1971) (decision under the post-1962 version of Bankruptcy Act § 59(b)), cited and quoted in *In re Furey*, 31 B.R. 495, 497 (Bankr. E.D.Pa.1983) (decision under Section 109(e)). That seems to be mere careless usage, because a tort claim may be both contingent and unliquidated, but the unliquidated character of the liability is not the source of the contingency. Liquidation, as the previously-outlined statutory unfolding that has culminated in Section 303(b)(1) shows, refers to certainty as to the money value of the claim. *In re Silver*, 109 F.Supp. 200, 203–04 (E.D.Ill.1953).

It follows a claim may be contingent but liquidated—for example a guaranty on a specific debt—or noncontingent and nonliquidated—for example a quantum meruit claim where services have admittedly been rendered in contemplation of compensation but their fair value is in dispute. Clearly the two concepts are independent.

Of course both the amount and the existence of liability may be disputed. In that respect, though *In re King*, 9 B.R. 376, 378 (Bankr.D.Ore.1981) said a "substantial dispute" as to liability or amount would make a debt "unliquidated," that decision has been specifically rejected by higher authority in its own circuit as "contrary to the express language of ... section [109(e)]." *Sylvester*, 19 B.R. at 673–74 (applying Section 109(e) ceiling "even though the debtor dispute[d] all or part of th[e] indebtedness"). See also *In re DeBrunner*, 22 B.R. 36, 36–37 (Bankr.D.Neb.1982) (fact that claim is disputed does not make it contingent or unliquidated under Section 109(e)).

---

**10.** That sort of contingent liability may be created by a so-called "aleatory contract," defined by Restatement of Contracts § 291 as "a promise conditional on the happening of a fortuitous event, or an event supposed by the parties to be fortuitous." Insurance and guaranty contracts are aleatory, as is a contract to sell something a person does not yet and may never own (such as an inheritance). In those cases the insurer's, guarantor's or seller's obligation to perform does not arise until there is a loss, a default or a death-plus-legacy. Aleatory contracts generally serve the purpose of shifting risks. See generally 3A *Corbin on Contracts* §§ 728–38 (1960).

There is a sound policy basis for the *Sylvester* approach. Section 109(e) erects a threshold limitation on persons or sole proprietorships eligible for filing under Chapter 13. Inevitably some claims presented to a Chapter 13 trustee will be disallowed if the debtor has a valid defense against them. But it would tend to generate a circular (and self-defeating) barrier to administration of Chapter 13 proceedings if the bankruptcy court had to pass on the merits of all claims before the proceeding could even get under way. *Comprehensive Accounting*, at 756; *In re Thomas*, 211 F.Supp. 187, 192 (D.Colo.1962), *aff'd per curiam*, 327 F.2d 667 (10th Cir.1964) (construing then-current version of Bankruptcy Act § 59(b)). Surely no debtor can be permitted to shoehorn himself or herself into Chapter 13 merely by disputing unsecured debts. Yet if a "bona fide dispute" were alone sufficient to take a debt out of the Section 109(e) calculation, the bankruptcy court would have to look into each dispute to determine whether it is bona fide.

Nor is this policy undercut by Congress' having chosen to add a bona fide dispute exception to Section 303(b)(1). That provision was intended to limit the ability of creditors to throw a debtor into bankruptcy involuntarily. Any debtor who presents a bona fide defense to his or her debts has a strong interest in keeping out of bankruptcy and the travails of reorganization if possible.[11] By contrast, Section 109(e) was intended to limit the ability of debtors to take voluntary advantage of the special protection Chapter 13 provides. Congress—which did *not* choose to add a "bona fide dispute" amendment to Section 109(e) in 1984—could rationally have believed greater limits were desirable to keep debtors from going into bankruptcy voluntarily than to keep them from being forced into it.

■ In sum, this Court agrees with what the majority of courts have said about the concepts of contingency and liquidation: Merely because a debtor disputes a debt, or has defenses or counterclaims, that does not render that debt contingent or unliquidated.[12] *Thomas*, 211 F.Supp. at 192. It remains then to apply the operative principles to the two debts at issue here.

### *Craig Debt*

■ Craig reduced its claim to judgment against Albanos personally before the Petition was filed. Albanos' only argument against considering the Craig debt both noncontingent and liquidated (they claim it was neither) is the pendency of an appeal, making the judgment "contingent upon the Seventh Circuit's entry of an order affirming the judgment" (Albanos Mem. 7).[13]

**11.** Nothing in the legislative history of the 1984 amendment adding the bona fide dispute provision to Section 303(b)(1) speaks to Congress' rationale. See 1984 U.S.Code Cong. & Ad.News 576 et seq. See also *In re Reid*, 773 F.2d 945, 947 (7th Cir.1985) (discussing diverse judicial views before enactment of the 1984 amendment).

**12.** One possible argument to the contrary (albeit one Albanos have not made) might be the Statement form (the "Form") supplied for use with Chapter 13 petitions (and filed by Albanos in this case). Under the section headed (emphasis in original):

*(c) Unsecured Debts.*—List all other debts, liquidated and unliquidated, including taxes, attorneys' fees and tort claims[ ]

there are two column subheadings, "Amount claimed by creditor" and "If disputed, amount admitted by debtor." At the bottom of the page, not quite centered under either column, is a blank for "Total unsecured debts." Thus the Form might be read as suggesting the distinction between "disputed" and "undisputed" debts is legally significant. As this opinion has established, any such suggestion would be incorrect as a matter of law to the extent it could be used in determination of the $100,000 limit. Of course an error in the Form cannot override the statutory meaning. It is more likely, in any case, that the Form's information as to what debts are "disputed" is intended to apprise the Bankruptcy Court as to the procedural requirements for proof of claims.

**13.** Later affirmance of Judge Hart's order in *Craig* is of course irrelevant to the present discussion. Section 109(e) speaks of noncontingency or liquidation as of the date the Petition was filed. *In re Kutner*, 3 B.R. 422, 424 (Bankr. N.D.Tex.1980), *appeal dismissed on other grounds*, 656 F.2d 1107 (5th Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

In view of the earlier discussion, the argument borders on the frivolous. Even after an order by the Court of Appeals affirming the judgment, on Albanos' reading the debt might be "contingent" upon denial of certiorari by the Supreme Court or, if certiorari were granted, upon that Court's ultimate affirmance. Albanos' asserted "contingency"—unfavorable court action—is not the sort contemplated by Section 109(e) in a case such as this, where liability is founded on a contractual claim to payment.

In any event, a final order of a district court is not simply in limbo until affirmed by the court of appeals. As 1B *Moore's Federal Practice* ¶ 0.416[3], at 521–22 (2d ed. 1984) (footnotes omitted) says:

> The federal rule is that the pendency of an appeal does not suspend the operation of an otherwise final judgment as res judicata or collateral estoppel, unless the appeal moves the entire case to the appellate court and constitutes a proceeding de novo.

Cf. *Instituto Nacional de Comercializacion Agricola (Indeca) v. Continental Illinois National Bank & Trust Co. of Chicago*, 576 F.Supp. 991, 997 (N.D.Ill.1983) ("Pendency of an appeal does not alter the preclusive effect of a criminal conviction").

Whatever perspective is applied to the debt to Craig, the consequence is the same. It was neither contingent nor unliquidated.

### Monitor Debt

■ When the Petition was filed, the debt to Monitor had been reduced to judgment against Corporations, not against Albanos personally. Albanos characterize that debt as "contingent and unliquidated" because it had not then been adjudicated as *their* liability.[14]

*Blehm*, 33 B.R. at 680 provides support for one (but only one) step in Albanos'

analysis. There the court, after discussing the general rule that liability founded in contract is not contingent while liability founded in tort is, analogized an action to pierce the corporate veil to a tort action ("In a sense, it is a remedy for a type of fraud perpetrated on the creditors"). Accordingly *Blehm* held liability was contingent on a judgment that the corporate form should be disregarded.

There is much force to that position. Of course the mere categorization of corporate-veil piercing as an action in tort cannot carry the day of itself. What *is* relevant is rather that any liability Albanos may have to Monitor can come into existence only upon a finding Corporations' veils ought to be pierced. See *In re Kelsey*, 6 B.R. 114, 118 (Bankr.S.D.Tex.1980) (general partner's debt contingent where creditors of limited partnership must look first to partnership assets to satisfy claims against the partnership). Absent an agreement to the contrary (and there is none here), the parties to a corporate transaction normally expect the corporate debtor to pay its debts. Any liability of corporate principals under the alter ego doctrine (see *Allied Chemical Corp. v. Randall*, 321 F.2d 320, 323 (7th Cir.1963)) is a back-up, contingent in the same way a guarantor's debt is contingent upon failure of the principal to pay. In the analytical terms already discussed, the amount of the debt is settled but Albanos' personal liability is contingent.

Craig and Monitor do not seriously contest that analysis, but they contend it has no application to this case. They argue Albanos are collaterally estopped from denying personal liability for Corporations' debts in view of the decisions in *Clarion* and *Craig I*.

---

14. Albanos Mem. 4 refers to an "action now pending" in the Circuit Court in that respect, citing to Case No. 81 L 24956 (the same one previously referred to, in which Monitor obtained its judgment against Corporations). This Court has been tendered only (a) the *Monitor* case's original Complaint naming Corporations and Albanos as codefendants, (b) Albanos' Answer and (c) the judgment against Corporations. Lacking further information, this Court has simply accepted Albanos' characterization of the suit's pendency against them—but the result in this proceeding is unaffected by that posture.

In *Clarion,* slip op. at 5 (footnote omitted) our Court of Appeals affirmed a jury verdict holding Albanos personally liable for a debt originally incurred by CCS:[15]

> The evidence at trial revealed a classic example of asset-stripping by the Albanos and circumstances which clearly warranted the piercing of the corporate veil....
>
> At the relevant time periods, Frank Albano was president and sole stockholder of CCS and [CCSD]. The Albanos were also the original incorporators of [CCSOL] and its sole stockholders. There was ample evidence that the various corporations paid each other's debts and employees.... It was undisputed that Frank Albano made the decision to have [CCSD] loan him $25,000.00 at a very low interest rate (7½%) and that he used the money to buy real estate which he then charged CCS, [CCSD], and [CCSOL] rent for occupying.... This loan was subsequently forgiven by the corporation....

*Clarion,* slip op. at 6 went on to confirm, under both Illinois and Seventh Circuit precedent, "the evidence overwhelmingly supported the jury's decision to pierce the corporate veil."

About a year after the *Clarion* decision, Judge Hart of this District Court entered the following order in *Craig Corp. v. Custom Car Stereo, Inc.,* No. 81 C 5087, slip op. at 2 (N.D.Ill. Nov. 1, 1983) ("*Craig III*"):

> Defendants are estopped from relitigating the question of whether or not they operated the corporate entities as their alter ego so as to warrant the piercing of the corporate veil or veils existing between them and the plaintiff. This issue is the same as was decided in the *Clarion* case. The issue was litigated in that action, and the judgment entered was dependent upon the determination of that

issue. It is not open for redetermination in this case.

Only one issue had gone to the jury in *Craig:* whether plaintiffs had waived personal recourse against Albanos (*id.,* slip op. at 3). That issue was decided against Albanos by the *Craig* jury. *Craig I,* slip op. at 1.

Without question Craig and Monitor can invoke "offensive collateral estoppel" here. Contrary to the assertion at Albanos Mem. 6, it is irrelevant that Monitor was not a party to *Clarion* or *Craig. Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 332–33, 99 S.Ct. 645, 652, 58 L.Ed.2d 552 (1979) held a party that received a " 'full and fair' opportunity" to litigate its claims in a prior action could be collaterally estopped from relitigating questions decided in that action —indeed, that was so even if offensive application of collateral estoppel would deprive the defending party of a jury trial on the previously-litigated issue (*id.* at 337, 99 S.Ct. at 654–55). Although the old "mutuality" rule (see, e.g., *Bigelow v. Old Dominion Copper Mining & Smelting Co.,* 225 U.S. 111, 127, 32 S.Ct. 641, 642, 56 L.Ed. 1009 (1912)) would have supported Albanos' position here, *Parklane Hosiery* teaches that rule is no longer a requisite of collateral-estoppel law.

Albanos retort the issues previously litigated in *Craig I* and yet to be litigated in *Monitor* (see n. 14) are not identical. In *Craig I,* Albanos' defense was a waiver by Craig of its right to pierce Corporations' veils; according to Albanos, the defense in *Monitor* is a waiver by Monitor of *its* right to do so.

That may perhaps be true, but it is irrelevant. It is profitable to remember the conceptually more accurate label for collateral estoppel is "issue preclusion." And *Craig III* (and before that *Clarion* ) specifically decided Albanos had so conducted Corporations' business as to cause Corporations to

---

**15.** Shortly after the *Clarion* suit was filed, Albanos incorporated CCSD and CCSOL and transferred to those two corporations all assets of CCS except the Clarion inventory and the outstanding debt. Clarion then added CCSD and CCSOL to its suit against CCS. All the corporate defendants defaulted at trial. *Clarion,* slip op. at 2.

become their alter egos. On *that* issue Albanos were bound as a matter of law when the Petition was filed. Any claimed waiver by Monitor of its right to assert that issue is simply an affirmative defense interposed by Albanos. In other words, Craig and Monitor are not at all asserting or relying on the jury's finding of no waiver in *Craig I.* What they instead urge as relevant for current purposes are the two prior determinations (in both *Clarion* and *Craig III*) that Corporations were the alter egos of Albanos.[16]

Albanos' defense of waiver by Monitor may or may not eventually prevail. But as this opinion has already pointed out, the existence of such an affirmative defense to liability—a "bona fide dispute"—does not make a debt "contingent." Once *Clarion* and *Craig III* were decided, Albanos were estopped from denying personal liability for Corporations' debts on the basis of the corporate veils.

Thus the contingency identified in *Blehm* had already occurred when the Petition was filed. Contrast *In re Reid,* at 947 (where there has been no judicial determination to pierce corporate veil, creditor's claim against corporate principal was subject to a bona fide dispute under Section 303(b)(1)). Like the debt owed to Craig, the obligation to Monitor was a noncontingent, liquidated, unsecured debt of Albanos at the time they sought to bring Chapter 13 into play.

### Conclusion

Neither the Craig nor the Monitor debt was either contingent or unliquidated when the Petition was filed. Together the two total more than $100,000, the ceiling established by Section 109(e) for Chapter 13 eligibility. Accordingly the Order is reversed and Albanos' Petition is hereby dismissed with prejudice.

16. That is eminently clear now that our Court of Appeals has canvassed the issue on appeal in *Craig II.* Judge Hart's discussion of the full scope of collateral estoppel doctrine may not have been as expansive as the Court of Appeals' treatment, but he unquestionably decided the question adversely to Albanos.