**In the Matter of ELSUB CORPORA-
TION, a New Jersey Corporation,
Alleged Debtor.**

**Bankruptcy No. 85–05972.**

United States Bankruptcy Court,
D. New Jersey.

April 25, 1986.

See also, Bkrtcy., 66 B.R. 189.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Michael R. Griffinger, Karen A. Giannelli, Newark, N.J., Weil, Gotshal & Manges by Edward C. Sobota, New York City, for Elsub Corp.

McCarter & English by Theodore Moskowitz, Joseph E. Irenas, Newark, N.J., Kirkland & Ellis by Richard F. Levy, Karla Ann Kraus, Chicago, Ill., for Playboy Enterprises, Inc.

Eugene M. Schwartz, Deputy Atty. Gen., State of N.J., Div. of Gaming Enforcement.

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

This matter is before the Court on a motion filed by Elsub Corporation (Elsub),

the alleged debtor herein, to dismiss the involuntary petition filed against it by Playboy Enterprises, Inc., (PEI). Pursuant to the Case Management and Scheduling Order entered by this Court on December 2, 1985, a hearing was conducted on the instant motion on December 10, 1985 for the sole purpose of determining whether PEI properly instituted a single-creditor involuntary petition against Elsub under 11 U.S.C. § 303(b)(2).

By its motion to dismiss the involuntary petition, Elsub argues that PEI is not entitled to maintain a single-creditor involuntary petition against Elsub because Elsub had more than twelve unsecured claims against it at the time of the filing of the involuntary petition, which claims were not contingent as to liability or the subject of bona fide disputes. Elsub bases its argument on the proposition that Elsub, as a general partner of Elsinore Shore Associates (ESA), a New Jersey partnership, is directly and primarily liable for the debts of ESA. PEI argues that Elsub's liability for ESA's obligations is contingent on the possible occurrence of a future event, specifically, that ESA's assets will not be sufficient to satisfy ESA's creditors. PEI concludes therefore, that ESA's creditors may not be taken into account in determining the number of Elsub's creditors for purposes of § 303 of the Bankruptcy Code.

This court finds that the holders of claims against ESA are holders of claims against Elsub, which claims are not contingent as to liability under 11 U.S.C. § 303(b)(1). Accordingly, Elsub had more than twelve creditors at the time the involuntary petition was filed, which claims were neither contingent as to liability, nor the subject of a bona fide dispute. Thus, a single creditor petition may not be maintained against Elsub under 11 U.S.C.

§ 303(b)(2), and at least three creditors were required pursuant to 11 U.S.C. § 303(b)(1) to file the involuntary petition.

The following facts are relevant to the limited issue presently before this Court:

1. Elsub, a wholly-owned subsidiary of Elsinore Corporation, is a New Jersey corporation which was formed in 1979.

2. ESA was formed on April 24, 1979, under the name Playboy-Elsinore Associates, by Elsub and Playboy of Atlantic City (PAC), a New Jersey limited partnership. Pursuant to the terms of the General Partnership Agreement dated April 24, 1979, the Partnership Agreement is governed by the laws of the State of New Jersey. Playboy of New Jersey, Inc. (PNJ), a wholly-owned subsidiary of PEI, was the sole general partner of PAC. PAC was formed as a limited partnership by PNJ, as general partner, and certain Atlantic City landowners as limited partners.

In March, 1984, Elsub acquired all the capital stock of PNJ for a purchase price of approximately $53,000,000.00 pursuant to an agreement dated February 15, 1984. At the closing, PNJ was renamed Elsinore of New Jersey, Inc., and PAC, the limited partnership of which PNJ was the sole general partner, was renamed Elsinore of Atlantic City.

ESA is the operator of the Atlantis Casino in Atlantic City, New Jersey. It is not disputed that ESA has more than twelve creditors whose claims against ESA are not contingent as to liability or the subject of a bona fide dispute. This court further finds for purposes of this motion, that apart from such creditors as Elsub may have as a result of its status as a general partner of ESA, Elsub has fewer than twelve creditors.[1]

---

1. Elsub, in its Reply Brief in Support of its Motion to Dismiss the Involuntary Petition, disputed PEI's assertion that Elsub, apart from such creditors as it might have as a result of its status as a general partner of ESA, has fewer than 12 creditors. The financial statements provided to PEI from Elsinore Corporation for the period from March 13, 1985 through August 21, 1985 consistently show fewer than twelve credi-

tors of Elsub. *See* Exhibit D to Response of PEI in Opposition to Debtor's Motion for Summary Judgment. Furthermore, Elsub has not yet come forward with any affirmative evidence to show the existence of more than 12 entities holding non-contingent claims against Elsub, apart from those creditors which Elsub might have as a result of its status as a general partner of ESA.

On November 13, 1985, PEI filed a single-creditor involuntary petition under Chapter 11 of the Bankruptcy Code against Elsub. In its petition, PEI asserts that it is a creditor of Elsub, and that its claims against Elsub are not contingent as to liability, and amount in the aggregate, in excess of the value of any lien held by it on Elsub's property securing such claim, to at least $5,000.00. PEI further states that "there are fewer than twelve persons holding claims against the Debtor that are not contingent as to liability or subject to a bona fide dispute."

PEI asserts in its petition that Elsub is indebted to PEI pursuant to a promissory note dated April 3, 1984, in the initial amount of $45,384,000.00. As of the date of the filing of the petition, the note allegedly had a principal balance of approximately $38,262,355.00, plus accrued and unpaid interest of not less than $2,348,155.00. PEI further asserts in its petition that Elsub is indebted to PEI for certain management fees in the amount of approximately $5,569,000.00 pursuant to a Confirmation Agreement dated April 3, 1984. Additionally, PEI contends that Elsub is generally not paying its debts as they become due and that an order for relief is necessary to recover to Elsub's estate alleged voidable preferences or fraudulent conveyances made by Elsub.

On November 14, 1985, Elsub filed a notice of motion seeking an order dismissing the involuntary petition with prejudice and seeking summary judgment in favor of Elsub on the grounds that: (1) the petition was not filed in good faith; (2) the involuntary petition was filed by one petitioning creditor, notwithstanding the fact that Elsub had more than twelve creditors; (3) this court lacks subject matter jurisdiction over the petition, and; (4) the petitioning creditor failed to state a claim upon which relief may be granted. Elsub, on November 14, 1985, also filed an Answer, Affirmative Defenses and a Counterclaim. By its counterclaim, Elsub asserts that PEI exercised bad faith in filing the involuntary petition which resulted in injury to Elsub and its affilitates. Accordingly, Elsub demands judgment dismissing the petition and awarding Elsub costs, attorneys' fees, proximate damages and punitive damages.

On November 14, 1985, ESA filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

The critical issue presently before this court is whether the debts of ESA are contingent or non-contingent as to liability with regard to Elsub. At the outset the Court notes that both parties herein rely upon information contained in financial statements to support their arguments regarding the nature of the liability between Elsub and ESA. PEI argues that in financial statements which Elsub furnished to PEI there was no showing of liability on the part of Elsub for ESA's obligations. Elsub argues that PEI received not only Elsub's financial statements but monthly ESA statements. To establish the requisite liability, Elsub also relies upon language in the February 15, 1984 Agreement pursuant to which Elsub acquired all the outstanding capital stock of PNJ. The Agreement provided:

> As of December 31, 1983, Elsub had no material liability of any nature, whether accrued, absolute, contingent or otherwise, and whether due or to become due, which was not reflected on or reserved against in the foregoing December 31, 1983 balance sheet of Elsub or referred to in the notes thereto in accordance with generally accepted accounting principles. Since December 31, 1983, no such liability has been incurred by Elsub, except such liabilities as have been incurred by PEA [now ESA] in the ordinary course of its business.

Elsub further contends that allegations made by PEI in a civil complaint filed by PEI against Elsinore Corporation, ESA, and Elsinore Finance Corporation are dispositive of the issue presently before the court. The complaint was filed by PEI in the United States District Court for the District of New Jersey, and it contained allegations regarding Elsinore Corpora-

tion's control of Elsub and ESA.[2]  This court finds that neither of the parties' arguments are dispositive of whether Elsub's liability for ESA debts is contingent or not contingent as to liability.

The issue presently before the court will ultimately be decided by an examination of relevant statutory and case law, and relevant legislative history underlying the Bankruptcy Code.

Section 303 of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984 (Bankruptcy Code) is entitled "Involuntary Cases."  To qualify as a petitioning creditor under Section 303(b) of the Bankruptcy Code, a creditor must be the holder of a claim against the alleged debtor which claim is not contingent as to liability or the subject of a bona fide dispute.  Title 11 U.S.C. section 303(b) provides:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject on [sic] a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims.

In order for this court to apply 11 U.S.C. § 303 to the instant facts, the term "claim" and the phrase "not contingent as to liability" must be defined.

Section 101(4) of the Bankruptcy Code defines "claim" to mean:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

The legislative history of 11 U.S.C. § 101(4) reveals that Congress intended to define "claim" broadly:

> The definition is any right to payment, whether or not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. . . .  By this broadest possible definition and by the use of the term throughout the title 11, especially in subchapter I of chapter 5, the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case.  It permits the broadest possible relief in the bankruptcy court.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 309, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5963, 6266.  *See also*, S.Rep. No. 989, 95th Cong., 2d Sess. 21–22, *reprinted*

---

**2.**  Elsinore Finance Corporation is a subsidiary of Elsinore Corporation.  Elsub argues that a review of PEI's factual allegations in the civil complaint filed by PEI in the United States District Court, *Playboy Enterprises, Inc. v. Elsinore Corporation, Elsinore Shore Associates and Elsinore Finance Corporation,* demonstrates that PEI clearly recognized and analyzed the structure and relationship of the Elsinore entities to reach conclusions that Elsub and ESA were the "alter egos" of Elsinore Corporation.  PEI has responded that PEI did not allege that Elsub and ESA are alter egos of Elsinore Corporation.  Instead, PEI contends that Elsinore Corporation so demonstrated and controlled its subsidiaries that those entities are the instrumentalities of Elsinore Corporation and Elsinore Corporation is liable for their debts.

*in* 1978 U.S.Code Cong. & Ad.News 5787, 5807–08.

The term "claim", as contained in 11 U.S.C. § 303(b)(1) has frequently been subject to judicial construction. The Third Circuit Court of Appeals, in the case of *Matter of M. Frenville Co., Inc.*, 744 F.2d 332 (3rd Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), reviewed an order of the United States District Court for the District of New Jersey. The District Court of New Jersey had dismissed an action against a debtor on the grounds that the action was barred by the automatic stay. In the course of its opinion, the Third Circuit Court of Appeals commented on the definition of "claim":

Although 'claim' is defined by § 101(4), the Code does not define when a right to payment arises. Thus, while federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law, 'is to be determined by reference to state law.'

744 F.2d at 337, (quoting *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946)). *See also, In re McMeekin*, 16 B.R. 805, 808 (Bkrtcy.D.Mass.1982); *In re Thomas*, 12 B.R. 432, 433 (Bkrtcy.S.D.Iowa 1981).

The phrase "not contingent as to liability", contained in 11 U.S.C. § 303 is not, however, defined by the Bankruptcy Code. Nonetheless, the term "contingent" refers to a distinct concept which has been judicially construed in cases under both the Bankruptcy Act and the Bankruptcy Code. *See, In re Albano*, 55 B.R. 363 (N.D.Ill. 1985).

In construing the phrase "not contingent as to liability", courts have traced 11 U.S.C. § 303 back to its inception. Section 59(b) of the Bankruptcy Act of 1898, provided that:

Three or more creditors who have provable claims against any person which amount in the aggregate, in excess of the value of securities held by them, if any, to five hundred dollars or over; or if all of the creditors of such person are less than twelve in number, then one of such creditors whose claim equals such amount may file a petition to have him adjudged a bankrupt.

Bankruptcy Act, ch. 541, 30 Stat. 544, 561 (1898). In 1938, Section 59(b) of the Bankruptcy Act was amended to provide that:

Three or more creditors who have provable claims fixed as to liability and liquidated as to amount against any person which amount in the aggregate in excess of the value of securities held by them, if any, to $500 or over; or if all of the creditors of such person are less than twelve in number, then one of such creditors whose claim equals such amount may file a petition to have him adjudged a bankrupt.

Bankruptcy Act, ch. 575, 52 Stat. 840, 868 (1938).

Under these sections of the Bankruptcy Act, a claim was not rendered contingent as to liability merely because it was unmatured. The case of *In re Myers*, 31 F.Supp. 636 (E.D.N.Y.1940), was decided under the Bankruptcy Act as amended in 1938. In *Myers*, the court determined that holders of notes were properly petitioning creditors even though some of the notes were not due until after the involuntary petition was filed, because the obligations were "absolutely owing" at the time of the filing. *Accord, In re Trimble Co.*, 339 F.2d 838, 844 (3rd Cir.1964) (holder of corporate notes may be petitioning creditor even if payment of notes conditional); *Kay v. Federal Rubber Co.*, 46 F.2d 64 (3rd Cir.1930) (holder of trade acceptances which are not due until future date may be petitioning creditor).

In 1952, § 59(b) was amended to provide that:

Three or more creditors who have provable claims liquidated as to amount and not contingent as to liability against any person which amount in the aggregate in excess of the value of securities held by them, if any, to $500 or over, or, if all of the creditors of such person are less than twelve in number, then one or

more of such creditors whose claim or claims equal such amount, may file a petition to have him adjudged a bankrupt.

Bankruptcy Act, Pub.L. No. 456, § 16, 66 Stat. 420, 425 (1952). In 1962, § 59 was again amended to provide that:

Three or more creditors who have provable claims not contingent as to liability against a person, amounting in the aggregate to $500 in excess of the value of any securities held by them, or, if all of the creditors of the person are less than twelve in number, then one or more of the creditors whose claim or claims equal that amount, may file a petition to have him adjudged a bankrupt; but the claim or claims, if unliquidated, shall not be counted in computing the number and the aggregate amount of the claims of the creditors joining in the petition, if the court determines that the claim or claims cannot be readily determined or estimated to be sufficient, together with the claims of the other creditors, to aggregate $500, without unduly delaying the decision upon the adjudication.

Bankruptcy Act, Pub.L. No. 87–681, § 7, 76 Stat. 570, 571 (1962).

■ Section 303(b) of the Bankruptcy Reform Act of 1978 permitted the filing of an involuntary petition:

(b) An involuntary case is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549,

or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims.

11 U.S.C. § 303(b) (1978).

It is significant to note that under the Bankruptcy Reform Act of 1978 there was no longer a requirement that claims be provable in order for an involuntary petition to be brought. Thus, holders of unmatured, disputed and unliquidated claims are not specifically barred from being petitioning creditors. *See, e.g., Matter of Covey,* 650 F.2d 877, 881 (7th Cir.1981). The elimination of the requirement of a provable liquidated claim has been interpreted to evidence a Congressional policy in favor of a liberal taking of jurisdiction in an involuntary case. *See, e.g., In re Turner,* 32 B.R. 244, 248 (Bkrtcy.D.Mass.1983).

■ Finally, 11 U.S.C. § 303(b) was amended in 1984, upon the passage of the Bankruptcy Amendments and Federal Judgeship Act of 1984, to its present form which permits the filing of an involuntary petition in bankruptcy:

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject on [sic] a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims.

11 U.S.C. § 303(b) (1984).

This statutory development has led at least one court to remark that bankruptcy parlance has connected the concept of contingency with the notion of liability *vel non,* and the concept of liquidation with the

notion of reduction to an ascertainable dollar amount. *In re Albano,* 55 B.R. at 366.

The court in the case of *In re All Media Properties, Inc.,* 5 B.R. 126 (Bkrtcy.S.D. Tex.1980), *aff'd per curiam,* 646 F.2d 193 (5th Cir.1981) defined contingent claims as follows:

claims are contingent as to liability if the debt is one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred.

5 B.R. at 133, *cited with approval in, Matter of Gill Enterprises, Inc.,* 15 B.R. 328, 331 (Bkrtcy.D.N.J.1981). *Accord, In re Johnston Hawks, Ltd.,* 49 B.R. 823, 829 (Bkrtcy.D.Hawaii 1985); *In re McMeekin,* 16 B.R. 805, 807 (Bkrtcy.D.Mass.1982). Courts have concluded that the phrase claims "not contingent as to liability," as contained in 11 U.S.C. § 303, incorporates the ordinary meaning of a contingent claim, which is a claim that has not accrued and that is dependent upon a future event. *See, e.g., In re Dill,* 30 B.R. 546, 548 (Bkrtcy. 9th Cir.1983), *aff'd,* 731 F.2d 629 (9th Cir.1984); *In re McNeil,* 13 B.R. 434, 436 (E.D.Tenn.1981).

In attempting to construe the phrase "not contingent as to liability", the court in *In re All-Media Properties, Inc.,* looked to "classic" examples of contingent liability. One example cited by that court is guarantors of promissory notes who are secondarily liable for principal debtors' obligations. Guarantors, by definition, are only liable if the principal debtor defaults. Another classic example of contingent liability cited by the *All-Media* court is the liability of a defendant in a negligence action, where the parties, at the time of the alleged negligent act, contemplated that the alleged tortfeasor would be liable only if found to be so by a competent tribunal. 5 B.R. at 133. Courts have also noted that contingent liability as referred to in the

Bankruptcy Code may be created by "aleatory contracts." Examples of aleatory contracts are insurance and guaranty contracts, pursuant to which, the insurer's or guarantor's obligation to perform does not arise until there is a loss or default. *See, In re Albano,* 55 B.R. 363 (N.D.Ill.1985).

The case of *In re Blehm,* 33 B.R. 678 (Bkrtcy.D.Colo.1983), also looked to guaranty/surety situations and tort claims in defining contingent debts. In *Blehm,* several creditors of a corporation operated by Chapter 13 debtors filed proofs of claim against the individual debtors. The creditors alleged that the individual debtors operated the corporation as a sham and that therefore the creditors of the corporation should be allowed to "pierce the corporate veil" and assert their claims directly against the debtors. Permitting such claims would render the debtors ineligible for Chapter 13 relief pursuant to 11 U.S.C. § 109(e). Title 11 U.S.C. § 109(e) provides that individuals are eligible for Chapter 13 relief if they incur "noncontingent, liquidated, unsecured debts of less than $100,-000." The *Blehm* court held that the veil-piercing claims were contingent and should not be included in the computation of the individuals' indebtedness under 11 U.S.C. § 109(e). In so holding, the court stated:

The classic examples of contingent debts are the guarantor/surety situations and a tort claim on which no judgment has been entered. The guarantor situation is obvious—there liability is dependent on a future uncertain event—the default of the primary obligor. Tort claims have been considered contingent because they require proof by the plaintiff creditor of the debtor's liability and the amount of damages are, by their very nature, not fixed unless and until a judgment is entered setting the debtor's liability.

33 B.R. at 679–80.

In the case of *In re Flaherty,* 10 B.R. 118 (Bkrtcy.N.D.Ill.1981), a Chapter 13 debtor was the officer of various corporations. A bank loaned money to the corporations as well as to the debtor personally.

The loans provided that upon default, the remaining indebtedness would become immediately due and payable. The debtor signed absolute, unconditional, unlimited guarantees of the corporate indebtedness, by which the debtor assured full payment upon maturity of the corporate indebtedness. All of the loans were in default. The Bank filed a motion to dismiss the debtor's Chapter 13 petition on the grounds that the debtor was ineligible for Chapter 13 relief pursuant to 11 U.S.C. § 109(e). The Bank asserted that the debtor had in excess of $100,000.00 of non-contingent, liquidated, unsecured debts when the petition was filed. Although the Bank had not yet sued the debtor individually or taken any legal action against the debtor on the guarantees, the court held that the debtor's liability under the notes had matured and was not contingent upon the happening of any future condition. The court based its conclusion upon the fact that the underlying notes were in default, making the debt immediately due and payable, and the fact that pursuant to Illinois law, a guarantor was liable for the underlying notes upon default. 10 B.R. at 119.

Regardless of whether an alleged tortfeasor will actually pay money as a result of the alleged tortious conduct, even tort claims have recently been recognized by several courts to be non-contingent claims. In the case of *In re B.D. International Discount Corp.*, 13 B.R. 635 (Bkrtcy.S.D. N.Y.1981), Chase Manhattan Bank (Chase) filed an involuntary Chapter 7 petition against a dealer in money market instruments. Chase was the alleged debtor's primary banker and alleged sole creditor. Prior to the filing of the involuntary petition, Chase had commenced an action in New York State Superior Court against several defendants including two employees and officers of the alleged debtor. The alleged debtor, however, was not named as a defendant. Chase argued that while the state court complaint sounded in tort, the debt at issue was for money received or resulting from a bailment. The *B.D. International* court held that the alleged debtor's liability to Chase, while disputed, was

not contingent. 13 B.R. at 638. The court based its decision on the fact that there was no extrinsic event contemplated by the debtor and creditor at the time the erroneous transfer occurred that would trigger liability. *Id.*

The Second Circuit Court of Appeals, in a related proceeding, *In re B.D. International, Discount Corp.*, 701 F.2d 1071 (2d Cir.), *cert. denied*, 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983), stated:

> In order to qualify a claim as a basis for seeking involuntary bankruptcy, a claimant need not make out a case warranting summary judgment although in fact [petitioner] came close to this. It is sufficient to establish, as [petitioner] did here, that there are good grounds for the claim and that no defenses have been asserted in substantiable form.

701 F.2d at 1077 (footnote omitted).

Similarly, in the case of *In re Longhorn 1979—II Drilling Program*, 32 B.R. 923 (Bkrtcy.W.D.Okla.1983) (*Longhorn*), an involuntary petition in bankruptcy was filed against a partnership. The involuntary petition was filed as a result of numerous lawsuits being instituted against the partnership. In the course of its decision, the *Longhorn* court concluded that creditors' tort claims are not contingent as to liability. In so concluding, the *Longhorn* court, summarized prior judicial interpretations of the word contingent as it is contained in 11 U.S.C. § 303(b)(1) as follows:

> Each of these [cases] contemplates a claim being contingent as to liability when some future event *in the relationship of the parties* must occur before liability fixes or attaches. In this connection 'liability' does not mean the same as judgment or remedy, but only a condition of being obligated to answer for a claim. Therefore, there is liability when all the elements required for a claim under § 104(a) [sic] are in existence and all the underlying events have accrued. So long as all the facts which give rise to the tort action have occurred the claim is accrued and there is no contingency as to liability in the bankruptcy sense.

32 B.R. at 927 (footnote omitted).

The *Longhorn* court further stated:

Liability in connection with the phrase 'contingent as to liability' must be construed narrowly as a state of circumstances where one is bound in law to do, pay, or make good something which can be enforced by legal action. When all the events have occurred which allow a court to adjudicate a claim and determine whether or not payment should be made, there is no contingency concerning the claim itself. The contingency is applicable only to payment and is only a condition of payment. This logic applies impartially to actions which sound in tort as well as contractual obligations.

32 B.R. at 928 (footnote omitted). Accordingly, contingency as to liability and contingency as to payment are clearly two distinct concepts.

The Third Circuit, in the case of *In re Trimble Company*, 339 F.2d 838 (3rd Cir. 1964), construed Section 59(b) of the Bankruptcy Act, as amended in 1952. The court established that holders of notes, which were issued by a corporation for stock purchased from stockholders, were creditors of the corporation who had provable claims, liquidated as to amount and not contingent as to liability. Thus, the holders had a right to commence an involuntary bankruptcy proceeding against the corporation. The court so held despite Pennsylvania Business Corporation Law which impliedly prohibited the corporation from paying the notes until its financial condition so permitted. According to Pennsylvania Business Corporation Law, payment would be illegal if the corporation had " 'no unrestricted or unreserved earned or capital surplus legally available' for such payment." 339 F.2d at 840. The Third Circuit reasoned as follows:

the petitioners are 'creditors who have provable claims liquidated as to amount and not contingent as to liability' against the Company in excess of $500. On March 31, 1961, it became liable on four of the notes bearing that date even though the Law impliedly prohibited it from paying them until such time as its financial condition permitted. [citations omitted] When the Company persisted

for 30 days or more in its refusal to pay after being notified that payment had not been made, the amount of the four remaining notes became owing. [citations omitted] The fact that the payment of a note may be conditional does not mean that the liability for that payment is contingent. No additional act or event, fortuitous or otherwise, need have occurred here before liability on the notes attached.

339 F.2d at 844 (footnotes omitted).

Turning to New Jersey law, it is clear that partners become liable for partnership debts immediately upon becoming partners. N.J.Stat.Ann. § 42:1–15 (West 1940), a section of the New Jersey Uniform Partnership Law, sets forth the liability of partners:

All partners are liable:

a. Jointly and severally for everything chargeable to the partnership under sections 42:1–13 and 42:1–14 of this title.

b. Jointly for all other debts and obligations of the partnership; but any partner may enter into a separate obligation to perform a partnership contract.

Under § 42:1–15(a) joint and several liability applies to debts for a partner's wrongful acts or misapplication of funds. Under § 42:1–15(b), joint liability applies to all other debts and obligations of the partnership.

The Uniform Partnership Law was adopted in New Jersey in 1919. Courts have held that the Uniform Partnership Law regarding partners' liability for partnership debts is declaratory of the common law principal of mutual agency of the partnership. *See, Malanga v. Manufacturers Casualty Insurance Co.*, 28 N.J. 220, 227, 146 A.2d 105 (1958). Pursuant to this principle, every member of a partnership is liable for torts which are committed by other members of the partnership while acting in the scope of business. *Id.* This liability attaches regardless of whether the liable partner participated in, ratified, or had knowledge of such torts. *Id.*

The Supreme Court of New Jersey, in the case of *Mazzuchelli v. Silberberg*, 29 N.J. 15, 148 A.2d 8 (1959), held that the Uniform Partnership Law, as adopted in New Jersey does not embrace an "entity" theory with regard to liability. Pursuant to the entity theory, a partnership is a jural entity distinct from its partners. The *Mazzuchelli* court maintained that with respect to liability for performance of partnership obligations, members of a partnership were personally liable and immediately suable. 29 N.J. at 21–22, 148 A.2d 8.

The *Mazzuchelli* court recognized that pursuant to the uniform partnership law, a partnership is a separate entity from its individual partners for the purpose of marshalling assets. Prior to the enactment of the uniform partnership law, a firm creditor could be compelled, in equity, to proceed against the firm estate, before proceeding against the separate estates of individual members of the firm. *See, e.g., Buckingham v. Ludlum*, 37 N.J. Eq. 137 (Ch. 1883), *aff'd*, 41 N.J. Eq. 539 (E & A 1886) (creditor of firm may secure payment of debt from individual assets left by deceased partner if surviving partner is insolvent and firm assets exhausted); *Davis v. Howell*, 33 N.J. Eq. 72 (Ch. 1880), *aff'd*, 34 N.J. Eq. 292 (E & A 1881) (partnership debts entitled to priority of payment from partnership estate, individual partners' debts entitled to priority of payment from individuals' estates, thus partnership creditors could seek payment from surplus of individual partners' estates after payment of individual partners' debts). This equitable concept of exhaustion of assets, however, was not consistently applied by the courts prior to the enactment of the uniform partnership law. *See, e.g., Randolph v. Daly*, 16 N.J. Eq. 313, 316 (Ch. 1863) (partnership creditor need not aver that firm is insolvent to levy upon individual partner's property); *Wisham and Kay v. Lippincott*, 9 N.J. Eq. 353, 354 (Ch. 1853) (court refused to compel joint creditor to proceed against joint estate before proceeding against estate of individual partner since partnership contract is several as well as joint).

The doctrine of exhaustion of assets, however, is irrelevant to the question of liability. Instead, the doctrine of exhaustion of assets is concerned with the distribution of assets. *See, Greene v. Butterworth*, 45 N.J.Eq. 738, 739–40 (Ch. 1889).

The joint liability of partners for partnership obligations under the uniform law renders partners directly liable for partnership debts. Thus, any contingency regarding a partner's satisfaction of partnership obligations relates not to a partner's liability, but rather to whether a partner will actually have to pay a claim against the partnership.

■ Turning to federal law, courts have long recognized the principal of ratable distribution of assets amongst debtors' creditors. *See, Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). Similarly, the equitable doctrine of marshalling of assets requires a creditor, who may satisfy his or her claim from more than one fund, to look first to the fund that is not subject to the demand of a junior creditor. *See, Matter of Central Railroad Co. of New Jersey*, 45 B.R. 1011, 1020 (D.N.J.1985).

■ Pursuant to the entity theory of partnership law, a partnership can be adjudged a bankrupt as a separate entity, without reference to the bankruptcy of its partners as individuals. In the case of *In re Jercyn Dress Shop*, 379 F.Supp. 1119 (E.D.N.Y.1974), *aff'd*, 516 F.2d 864 (2nd Cir.1975), an involuntary petition was commenced against Jercyn Dress Shop and two of Jercyn's partners individually and as general partners. The partnership had previously made a general assignment of its assets for the benefit of its creditors. The bankruptcy court granted the individual partners' motion to dismiss the petition against them as individuals and as general partners. The petitioners appealed the decision of the bankruptcy court, and the district court affirmed the decision of the bankruptcy court. The district court held that the general assignment of assets constituted an act of bankruptcy by the part-

nership, but was not an act of bankruptcy by the individual partners. The decision of the district court was appealed, and the Second Circuit Court of Appeals, affirmed the District Court decision. In so doing, the Second Circuit noted that although the individual partners were not automatically deemed bankrupt as a result of the general assignment, the partnership creditors had ample protection "because each general partner remains primarily liable for the partnership debts." 516 F.2d at 868.

In the case of *Francis v. McNeal*, 228 U.S. 695, 33 S.Ct. 701, 57 L.Ed. 1029 (1912), the United States Supreme Court, in reviewing a Third Circuit case, required an individual partner to turnover his personal estate for administration to the trustee in bankruptcy of the partnership. The Supreme Court, in *Francis v. McNeal*, limited the applicability of the entity theory of partnership law by stating:

> the notion that the firm is an entity distinct from its members has grown in popularity, and the notion has been confirmed by recent speculations as to the nature of corporations and the oneness of any somewhat permanently combined group without the aid of law. But the fact remains as true as ever that partnership debts are debts of the members of the firm, and that the individual liability of the members is not collateral like that of a surety, but primary and direct, whatever priorities there may be in the marshaling of assets. The nature of the liability is determined by the common law, not by the possible intervention of the bankruptcy act. Therefore ordinarily it would be impossible that a firm should be insolvent while the members of it remained able to pay its debts with money available for that end. A judgment could be got and the partnership debt satisfied on execution out of the individual estates.

228 U.S. at 699–700, 33 S.Ct. at 702.

Despite the priority of partnership creditors' claims to partnership assets and of individual partners' creditors' claims to individual partners' assets, the *Francis v.*

*McNeal* court held that the trustee of a bankrupt partnership could administer the estate of a non-bankrupt general partner, and could utilize the surplus of the general partner's assets to satisfy partnership debts. *See also, In re Meyer*, 98 Fed. 976, 979 (2nd Cir.1899) (partnership may be bankrupt irrespective of bankruptcy of individual partners, bankrupt partnership may equitably marshall and distribute assets of individual partners together with those of partnership).

In *Matter of Elemar Associates*, 3 B.C.D. 958 (Bkrtcy.S.D.N.Y.1977) a Chapter XI partnership debtor obtained a temporary injunction restraining a judgment creditor from collecting a judgment from a general partner. The creditor had obtained a judgment against, among others, Elemar Associates and one of its partners. The partnership subsequently filed a petition in bankruptcy, thereby precluding the creditor from pursuing his remedies against the partnership. The debtor then filed a complaint to restrain post-judgment remedies against any of its general partners. The *Elemar* court unequivocally interpreted bankruptcy legislation as standing for the proposition that a partnership and its general partners are separate and distinct entities. The court concluded that although joint or partnership property is looked to first in satisfying partnership debts, each partner remains absolutely liable for the entire amount of partnership debts. 3 B.C.D. at 960. The *Elemar* court held that where a general partner may be held liable for partnership debts, the general partner's assets may be appropriated regardless of the fact that the general partner is not bankrupt. Accordingly, the court refused to permit the judgment creditor to levy upon the assets of the nonbankrupt general partner since those assets could be utilized by the partnership debtor to satisfy its other creditors. The court reasoned that permitting such a levy contravened the equality of treatment which is the basis of the complete congressional scheme dealing with insolvent entities. 3 B.C.D. at 960.

In the case of *In re Lamb,* 40 B.R. 689 (Bkrtcy.E.D.Tenn.1984), a trustee in bankruptcy for a partnership recovered a judgment against a partner, Charles Lamb, holding him liable for partnership debts. Three of the partnership's creditors then filed an involuntary petition in bankruptcy against Lamb. Lamb subsequently filed a voluntary petition in bankruptcy. Lamb argued that the trustee was "not entitled to file an involuntary bankruptcy petition against a person indebted to the bankruptcy estate and [that] the claims of the three petitioning creditors were merged in the trustee's judgment." 40 B.R. at 692.

The court addressed the issue of whether the trustee of a partnership who has a judgment against a partner under § 723 of the Bankruptcy Code is the "holder of a claim" under 11 U.S.C. § 303(b)(1) and (b)(2). The court concluded that a trustee, who had established a claim against a general partner, was not disqualified from filing an involuntary petition against the individual partner under 11 U.S.C. § 303(b)(1) or (b)(2). The court stated:

> There is nothing about a partnership's bankruptcy and a trustee's judgment under § 723 against one of the partners that deprives the partnership's creditors of their individual 'claims' against the partner. Certainly three of the partnership's creditors should be able to commence an involuntary case against the partner despite the trustee's judgment under § 723. The court does not believe that § 723 was meant to deprive them of this right. Section 723 simply provides one means of collecting from a partner on behalf of the partnership's creditors. The partner can be protected from having to pay twice without holding that the partnership's creditors cannot commence an involuntary case against him.

40 B.R. at 692–93.

■ It is an uncontroverted principle, codified by many states, as well as by the New Jersey Uniform Partnership Laws, that the liability of a partner for partnership debts is joint. Notwithstanding the equitable principle that partnership creditors should look first to partnership property for payment and then to individual partners' assets to satisfy any deficiency, the liability of individual partners for partnership debts is direct and primary, as required by Section 303 of the Bankruptcy Code.

■ In attempting to define "contingent" under § 303 of the Bankruptcy Code, PEI relies upon cases addressing Chapter 13 eligibility under Section 109(e) of the Bankruptcy Code.

Section 109(e) of the Bankruptcy Code provides that:

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000 may be a debtor under chapter 13 of this title.

PEI relies primarily on the case of *In re Norman,* 32 B.R. 562 (Bkrtcy.W.D.Mo. 1983). In *Norman,* the former spouse of a Chapter 13 debtor, as the principal creditor of the debtor, filed a motion to dismiss the bankruptcy petition filed by the debtor. The former spouse alleged that the debtor was not eligible to file a Chapter 13 petition since his unsecured debts exceeded the amount allowed under Section 109(e) of the Bankruptcy Code. The former spouse further argued that in calculating the amount of the debtor's debts, debts for which the debtor is personally liable, as well as debts arising out of a partnership for which he may be liable, must be included. The *Norman* Court noted that under Missouri law, partners are jointly and severally liable for partnership debts, and partnership creditors must satisfy their claims from partnership assets before gaining access to the assets of individual partners. Therefore,

the court concluded that the debtor's liability for the partnership debts was contingent and need not be included in determining the debtor's eligibility for Chapter 13 relief. 32 B.R. at 565.

In its discussion of partnership debts, The *Norman* court cited the case of *In re Kelsey,* 6 B.R. 114 (Bkrtcy.S.D.Tex.1980). In *Kelsey,* one of the issues addressed by the court was a debtor's eligibility for Chapter 13 relief. The Trustee in *Kelsey* alleged that the debtor was ineligible for Chapter 13 relief because the amount of the debt scheduled by the debtor exceeded the limits imposed by 11 U.S.C. § 109(e). The debtor was a general partner in a number of limited partnerships. The debtor argued that since creditors of the partnerships must seek satisfaction of their claims from partnership assets before seeking payment from individual partners' assets, his liability for partnership debts was contingent upon the insufficiency of partnership assets to meet partnership liabilities. The *Kelsey* court examined Texas law and determined that creditors of a partnership need not exhaust partnership assets before seeking satisfaction of their claims from individual partners' assets. Thus, the court concluded that the debtor's liability was not contingent, and that the petition should be dismissed. The *Kelsey* court grounded its decision upon the following analysis:

In *All Media Properties,* [5 B.R. 126] 80–00011–HP (S.D.Tex.1980) this court recently held that a contingent debt is one that will not come into existence except on the occurrence of some future triggering event, such as a default where the debtor is only secondarily liable. In this case, the debtor's obligation would be contingent only if the creditors of the limited partners must look first to the assets of the limited partnerships for payment before seeking payment from the debtor.

6 B.R. at 118.

This court declines to follow the reasoning and rationale of the *Kelsey* and *Norman* courts. It is clear that the joint liability of partners for partnership obligations under the uniform partnership law as codified in New Jersey renders partners directly liable for partnership debts. Any contingency which exists does not relate to a partner's liability, but rather to whether a partner will actually have to pay a claim. Contingency as to liability in the bankruptcy sense is distinct from contingency as to payment of a claim.

The final section of the Bankruptcy Code which this Court must address is Section 723, which contains express provisions concerning the rights of a partnership trustee against a partner. Section 723 provides:

(a) If there is a deficiency of property of the estate to pay in full all claims which are allowed in a case under this chapter concerning a partnership and with respect to which a general partner of the partnership is personally liable, the trustee shall have a claim against such general partner for the full amount of the deficiency.

(b) To the extent practicable, the trustee shall first seek recovery of such deficiency from any general partner in such partnership that is not a debtor in a case under this title. Pending determination of such deficiency, the court may order any such partner to provide the estate with indemnity for, or assurance of payment of, any deficiency recoverable from such partner, or not to dispose of property.

(c) Notwithstanding section 728(c) of this title, the trustee has a claim against the estate of each general partner in such partnership that is a debtor in a case under this title for the full amount of all claims of creditors allowed in the case concerning such partnership. Notwithstanding section 502 of this title, there shall not be allowed in such partner's case a claim against such partner on which both such partner and such partnership are liable, except to any extent that such claim is secured only by property of such partner and not by property of such partnership. The claim of the trustee under this subsection is

entitled to distribution in such partner's case under section 726(a) of this title the same as any other claim of a kind specified in such section.

(d) If the aggregate that the trustee recovers from the estates of general partners under subsection (c) of this section is greater than any deficiency not recovered under subsection (b) of this section, the court, after notice and a hearing, shall determine an equitable distribution of the surplus so recovered, and the trustee shall distribute such surplus to the estates of the general partners in such partnership according to such determination.

Section 723 has been held to apply only in cases under Chapter 7, and not to cases under Chapter 11 of the Bankruptcy Code. Kennedy, *Partnerships & Partners Under the Bankruptcy Reform Act & the New (Proposed) Bankruptcy Rules*, 27 St. Louis U.L.J., 507, 649 (1983). *See also*, 11 U.S.C. § 103(b), which provides, "Subchapters I and II of chapter 7 of this title apply only in a case under such chapter". Notwithstanding this restriction, this court is of the opinion that an examination of 11 U.S.C. § 723 is relevant to determine the congressional intent regarding the relation between partners' individual creditors and partnership creditors under the Bankruptcy Code.

Section 723 grants a partnership trustee the right to collect partnership debts from general partners when there is a deficiency of partnership property to pay all allowed claims. Under § 723(a), a partnership trustee has a claim for the full amount of any deficiency of the partnership estate, against each general partner who is personally liable on the claims. Pursuant to § 723(b), a partnership trustee is required, where practicable, to first seek recovery of such partnership deficiency from a general partner who is not a debtor in a case under chapter 11. Under § 723(b), prior to the determination that a partnership estate lacks sufficient funds to satisfy any claims against it, a court may order a non-debtor general partner, from whom the deficiency

would be recoverable, to provide the partnership estate with indemnity for, or assurance of payment of, any deficiency of the partnership estate which is found to exist. Accordingly, the court may also order a non-debtor general partner not to dispose of property. Under § 723(c), a partnership trustee has a claim against the estate of each general partner who is a debtor under title 11 for the full amount of all claims of creditors allowed against the partnership. Such partnership trustee's claims are automatically entitled to distribution. Pursuant to § 723(c) however, a claim for which a partner and a partnership are both liable, which claim is brought against a debtor partner after the entry of an order for relief in the partnership case, shall not be allowed except to the extent that the claim is secured only by property of the partner and not by property of the partnership. Finally, under § 723(d), if the amount that a partnership trustee recovers from debtor partners under § 723(c) exceeds any deficiency not recovered under § 723(b), the court, after notice and a hearing, shall determine an equitable distribution of the surplus. Accordingly, the partnership trustee shall distribute the surplus to the estates of the debtor partners.

Section 723(c) of the Bankruptcy Code eliminated the marshalling doctrine which had been contained in Section 5(g) of the Bankruptcy Act, 11 U.S.C. § 23(g). *See, In re I-37 Gulf Limited Partnership*, 48 B.R. 647, 649 (Bkrtcy.S.D.Tex.1985). The so-called "jingle rule" of the Bankruptcy Act had established a priority for claims of a partner's separate creditors over claims of partnership creditors upon distribution of a partner's estate under chapter 7 of the Bankruptcy Act. A partnership trustee now has the right under 11 U.S.C. § 723(c) to share in the distribution of the proceeds acquired by the liquidation of a partner's estate, without subordination to the partner's individual creditors. At least one commentator has stated that the relationship between partners and partnership creditors has been strengthened by eliminating the jingle rule. Kennedy, *Partnerships and Partners Under the Bankrupt-*

*cy Reform Act and the New (Proposed) Bankruptcy Rules,* 27 St. Louis U.L.J., 507, 544 & n. 189 (1983). Additionally, a partnership creditor's standing to file a petition in bankruptcy for relief against an individual partner is strengthened. Furthermore, the joinder of partnership creditors with a partner's separate creditors as co-petitioners against a partner is consistent with the provisions of 11 U.S.C. § 723(c).

The interrelationship between involuntary relief under 11 U.S.C. § 303 and a partnership trustee's claims under 11 U.S.C. § 723 has been noted both in legislative history and in commentary. For example, the House Report to Section 303 provides:

> An involuntary petition may be filed against a partner whether or not the partnership in which such partner is a partner is a debtor in a case under title 11. Since section 40 of the Uniform Partnership Act requires a partner to make contributions necessary for payment of all partnership liabilities, holders of claims against the partnership would be holders of claims against the partner for purposes of 11 U.S.C. § 303. This is true even though such claim would not be allowed under 11 U.S.C. § 723(c) if the partnership were a debtor under chapter 7.

H.R. Report No. 595, 95th Cong., 1st Sess. 198 (1977), *reprinted in* 1978 U.S. Code Cong. & Ad. News at 6158–59.

Consistently, one commentator has stated:

> Requiring qualified petitioners to delay filing an involuntary petition runs counter to the congressional purpose of facilitating such filing when grounds exist. While the legislative history does not contain an express recognition of this purpose, Congress enacted most of the reforms recommended by the Commission on Bankruptcy Laws, created by Act of July 24, 1970, Pub.L. No. 91–354, 84 Stat. 468, to effectuate this purpose. [citation omitted] Delay in filing a petition aggravates the risk that the estate of a

debtor will depreciate, diminish, or disappear before the assets are collected and converted into distributable proceeds. Also, voidable transfers could become invulnerable to attack due to the short statutes of limitations applicable to some of the trustee's rights of avoidance. Without indicating that any of these considerations were involved in its conclusion, the *House Report, supra* note 2, at 198, *reprinted in* 1978 *U.S. Code Cong. & Ad.News* at 6158–59, declared that the holder of a claim against the partnership is an eligible petitioner against a partner 'even though such claim would not be allowed under 11 U.S.C. § 723(c) if the partnership were a debtor under chapter 7.' The reason for the disallowance of the partnership creditor's claim in the partner's case, however, is to prevent double allowance of a single claim. [citation omitted] The restriction on the permissibility of the partnership creditor's claim should have no bearing on the eligibility of the holder of such a claim as a petitioner for involuntary relief against the partner.

Kennedy, *Partnerships and Partners Under the Bankruptcy Reform Act and the New (Proposed) Bankruptcy Rules,* 27 St. Louis U.L.J., 507, 535 n. 141 (1983).

■ Based upon the foregoing, this court finds that the debts of ESA are debts of Elsub which are not contingent as to liability under 11 U.S.C. § 303(b)(1). Pursuant to New Jersey Uniform Partnership Law, N.J.Stat.Ann. § 42:1–15, Elsub is jointly liable and in certain instances jointly and severally liable for the partnership debts of ESA, and Elsub is required to make contributions for payment of all partnership liabilities of ESA. N.J.Stat.Ann. § 42:1–18 provides that partners must contribute to losses suffered by the partnership pursuant to his or her share in the profits. Furthermore, N.J.Stat.Ann. § 42:1–40 provides that upon the dissolution of a partnership, the partners thereof must satisfy the partnership liabilities.

■ Cases which have held that partnership debts are "contingent" debts of indi-

vidual partners until partnership assets are exhausted, have not distinguished between the concept of "contingent as to liability", as contained in 11 U.S.C. § 303, and the concept of contingent as to payment. *See, e.g., In re Norman,* 32 B.R. 562 (Bkrtcy.W. D.Mo.1983); *In re Kelsey,* 6 B.R. 114 (Bkrtcy.S.D.Tex.1980). The equitable doctrine of marshalling of assets is irrelevant to the determination of contingency as to liability under 11 U.S.C. § 303. Both case law and New Jersey Uniform Partnership Law support the finding that a general partner is directly and primarily liable for claims of the partnership. Finding that general partners are not directly and primarily liable for partnership debts, and that partnership creditors hold claims contingent as to liability with respect to partners, would forbid partnership creditors, who are otherwise qualified to file an involuntary petition against a general partner, from filing such a petition until there has been a final determination as to the ratable distribution of partnership and individual partners' assets. Such a result runs contrary to congress' intent to facilitate involuntary filings where grounds exist.

Having determined that Elsub had more than 12 creditors at the time the involuntary petition was filed, which claims were not contingent as to liability or the subject of a bona fide dispute, and that at least three such creditors are required to file an involuntary petition against Elsub under 11 U.S.C. § 303(b)(1), this Court must now examine the relative rights of the parties.

Title 11 U.S.C. Section 303(c) provides: After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section. Bankruptcy Rule 1003(d), moreover, requires that the court afford creditors a reasonable opportunity to join in the petition. That rule provides:

(d) **Joinder of Petitioners After Filing.** If the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors with their addresses, a brief statement of the nature of their claims, and the amounts thereof. If it appears that there are 12 or more creditors as provided in § 303(b) of the Code, the court shall afford a reasonable opportunity for other creditors to join in the petition before a hearing is held thereon.

■■■■■ Under both the Bankruptcy Act and the Bankruptcy Code, intervention in an involuntary petition has been held to be a matter of right. *See, e.g., In re Thomas,* 211 F.Supp. 187, 193 (D.Colo.1962); *Matter of Trans-High Corp.,* 3 B.R. 1, 4 (Bkrtcy.S. D.N.Y.1980). Intervention may be disallowed where the court finds that the petition was filed in bad faith or for the purpose of improperly invoking the bankruptcy court's jurisdiction. *See, In re Thomas,* 211 F.Supp. 187 (D.Colo.1962). So long as intervention is permissible, the bankruptcy court retains jurisdiction over an involuntary proceeding which was commenced with an insufficient number of petitioners. *See, e.g., In re Mason,* 709 F.2d 1313, 1318–19 (9th Cir.1983); *In re Earl's Tire Service, Inc.,* 6 B.R. 1019, 1022 (D.Del.1980); *In re Midwest Processing Co.,* 41 B.R. 90, 102 (Bkrtcy.D.N.D.1984). Accordingly, the court will retain jurisdiction over the involuntary petition presently before the court.

■■■■ It is presumed that good faith has been exercised in the filing of an involuntary petition in bankruptcy, and the burden of showing bad faith rests on the alleged debtor or upon any other interested party. *See, In re Crown Sportswear, Inc.,* 575 F.2d 991, 993 (1st Cir.1978). Elsub has asserted in its answer and counterclaim to the involuntary petition, and in its motion to dismiss the involuntary petition, that the involuntary petition was not filed by PEI in good faith and that accordingly the petition should be dismissed. This is an issue of fact and law which must subsequently be

determined by this court, and which impacts upon the rights of additional creditors to join in the petition. The Case Management and Scheduling Order of December 2, 1985 provides that subsequent motions by PEI to amend or otherwise sustain the involuntary petition shall not be decided until a determination has been made, after appropriate discovery and hearing, regarding whether the involuntary petition was filed in good faith pursuant to 11 U.S.C. § 303(b)(2). In the interim, pursuant to Bankruptcy Rule 1003(d), the court will send notice to all known creditors of Elsub informing them of the court's findings, and affording them a reasonable opportunity to join in the petition. Whether such intervention will ultimately be allowed will be determined concurrently with this Court's findings on the issue of good faith.

An order consistent with this opinion was entered on February 28, 1986.