### In re BROOKLYN RESOURCE RECOVERY, INC., Alleged Debtor.

Bankruptcy No. 194–18986–353.

United States Bankruptcy Court, E.D. New York.

Dec. 17, 1997.

Sachs Kamhi & Kushner, P.C. by Gary M. Kushner, Carle Place, NY, for Petitioning Creditors.

Sherman, Citron & Karasik, P.C. by Robert Kolodney, New York City, for Alleged Debtor.

### DECISION AFTER TRIAL ON CONTESTED INVOLUNTARY CHAPTER 7 PETITION

JEROME FELLER, Bankruptcy Judge.

Today, this Court is asked to resolve a bitterly contested involuntary Chapter 7 petition. Unlike most cases however, the principal combatants here are not merely an unrelated group of petitioning creditors versus an alleged debtor. Instead, this seemingly implacable dispute is interwoven with the underlying and increasingly acrimonious business relationship between the three shareholders of the alleged debtor, Brooklyn Resource Recovery, Inc. ("BRR"), that pits Gerardo Muro against Allen Morris and Robert Rosselli (collectively, the "Shareholders"). Although he did not join the petition, Muro has funded nearly the entire litigation cost incurred by the three petitioning creditors and has an undisputed familial and/or business relationship with each: Gerardo Muro Jr. is his son; A–One Ready Mix & Building Supplies, Inc. ("A–One") is owned by his brother, Rocco Muro; and G. Fiore Concrete & Construction, Inc. ("Fiore") is owned by a long-time business associate, Glenn Fiore (collectively, the "Petitioning Creditors").

In this case, the Court has been left in the unenviable position of trying to decipher the truth from a trial record that is replete with inconsistency and conflicting testimony. Although the Shareholders seem to be experienced businessmen, it is astounding that much of the dealings between them were on the level of a promise and a handshake, perhaps indicative of the trust and friendship that formerly marked their relationship. Although millions of dollars were at stake, little thought was given to the possible negative future consequences that a lack of written and signed agreements (which would evince the legal relationships between the Shareholders) might engender. The relationship between the Shareholders eventually degenerated to the point where they were no longer on speaking terms.

BRR argues that the petition is an impermissible use of the Bankruptcy Code—employed merely to force resolution of a shareholders' dispute—and characterizes the Petitioning Creditors' claims as contributions to the corporation made on behalf of Muro, who remains responsible for any outstanding obligation due. In contrast, the Petitioning Creditors maintain that the petition is a permissible means to seek monetary recovery for past due bills that BRR has repeatedly left unpaid. The opponents also wage battle over whether BRR, as of the filing date, was generally not paying its

debts as they became due. The Petitioning Creditors allege that, in addition to their claims, BRR was overdue on payment to its commercial financier, trade creditors, and to Muro himself, for personal loans that he made to BRR and for concrete that his company supplied during the construction of the corporation's business facilities. BRR contends that it was current on some of these obligations, and that the remaining debts were simply not due.

Following a lengthy discovery period, the matter came before this Court on March 14, 1996 and consumed ten calendar days, with closing arguments held September 9, 1997.[1] Given the closeness that each Petitioning Creditor has with Muro, it is not altogether surprising that every minute aspect of this proceeding has been vigorously challenged from the outset, reflective of the incessantly caustic dispute that has transpired among the Shareholders. In fact, during their testimony, witnesses would at times characterize each other with epithets, and often they would seemingly disagree with each other's version of past events merely to disagree. In addition, the informal bookkeeping methods that BRR regularly employed led to a battle of expert accountants. The parties have seemingly engaged in an ex post facto reconstruction of what should have happened to protect their own interests, and although few of the witnesses offered testimony that was entirely credible, none were entirely unbelievable either. If this Court were to apply the maxim *falsus in uno, falsus in omnibus*, it is likely that there would be little credible testimony left to assess. We are not prepared, however, to say that any particular witness is lying, even though the testimony in this case is certainly self-serving. The Court's quandary, given the unreliability of much that was presented at trial, was to pick and choose the credible testimony that was most consistent with the entire record.

After considering the pleadings, pretrial memorandum, trial testimony, documentary evidence, credibility of witnesses, and both parties' Proposed Findings of Fact and Conclusions of Law, in addition to their closing arguments, this Court finds that each Petitioning Creditor holds a valid claim for monies owed by BRR. The Petitioning Creditors have failed to establish, however, that BRR was generally not paying its debts as they became due as of the filing date. Accordingly, BRR's involuntary chapter 7 case is dismissed. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

BRR's saga begins in late 1989, when Rosselli and Morris approached Muro with an investment opportunity to build and operate an ultra-modern, highly sophisticated recycling plant. The three agreed to launch BRR, which was incorporated on or about January 10, 1990, (Joint Pretrial Mem., Uncontested Facts ¶ 5), with Rosselli and Morris supervising the construction and running the business, and Muro, as silent partner in the venture, taking little or no part in the oversight of construction or in the day-to-day operations after the plant was completed. BRR is in the business of recycling junk automobiles, trucks, and heavy appliances, on a parcel of real property about two to three acres in size, located in the Canarsie section of Brooklyn, New York.[2] The property contains two buildings and a trailer situated on a vast, concrete-paved yard; the larger of the two buildings houses the heavy machinery utilized by the recycling operations, the other contains a generator that supplies the property with energy, and the trailer serves as an office. Scattered about the remaining portion of the concrete yard is various non-

---

1. The ten trial days were stretched over an eighteen month period because of various factors that included the Court's crowded docket, busy schedules of the attorneys and other professionals involved, unavailability of certain witnesses, and a six month hiatus devoted to settlement negotiations, which ultimately proved unsuccessful. For clarity, citations to the trial transcript will reference the trial date.

2. Stripped to nontechnical terms, old cars enter one side of the building whole and exit the other side separated into small bits of metal (sold to manufacturers as raw material) and fluff (the non-metallic remainder that is simply discarded).

descript machinery and equipment, as well as inventory and raw materials.

The equipment used for the recycling process was a major investment for BRR, but it was not the sole expense facing the corporation before it could begin operations. Because the property acquired for the plant was undeveloped, substantial funding was required first to clear the land, then to build and start operating the advanced recycling facility. To start the corporation, the individual Shareholders each made equivalent capital contributions of $500,000.00 (for a total of $1.5 million), with each receiving a one-third equity interest in the company. (*Id.* ¶ 12). At various times thereafter, direct personal loans were also extended to the corporation by the individual Shareholders ("Shareholder Loans") and were recorded in BRR's books under the designation "Shareholder Loan Accounts." (*Id.* ¶ 17). Muro eventually contributed funds that surpassed $1.3 million, while the overall individual investments of both Rosselli and Morris amounted to somewhat less, because of smaller subsequent Shareholder Loans that each extended to the corporation.[3]

With the initial funding of $1.5 million, construction was commenced in April or May of 1990. (Joint Pretrial Mem., Uncontested Facts ¶ 5; BRR's Proposed Findings of Fact ¶ 17). John Ferranti Contracting ("Ferranti") was hired to perform general contracting services and supervise the construction, (BRR's Proposed Findings of Fact ¶ 21), with Muro providing the bulk of the concrete that was used for paving the yard and pouring the foundations of the two buildings, through his company, Bay Ready Mix & Supplies, Inc. ("Bay"), augmented by a lesser amount of concrete provided by A–One, (*id.* ¶¶ 19–20; Petitioning Creditors' Proposed Findings of Fact ¶ 30). Ultimately, Bay delivered concrete valued at approximately $440,000.00, although only a portion of that amount, $104,000.00, is accounted for on BRR's books, (BRR's Proposed Findings of Fact ¶ 67; Petitioning Creditors' Proposed Findings of Fact ¶¶ 51–52), while A–One delivered approximately $86,000.00 worth of concrete, with no corresponding entry on BRR's books and records. (BRR's Proposed Findings of Fact ¶ 34).

During the initial stages of construction, Ferranti received periodic payments totaling several hundred thousand dollars. (Tr. 3/18/96, at 131). Those payments, combined with the expenses required to purchase equipment, depleted BRR's cash reserve, making it necessary for the corporation to obtain increased funding by late 1990. Therefore, BRR secured a $750,000.00 loan, on October 25, 1990, from the Bank Leumi Trust Company of New York ("Bank Leumi"), evidenced by a term note that was due on October 31, 1993 ("Term Note"). (Joint Pretrial Mem., Uncontested Facts ¶ 14; Petitioning Creditors' Ex. 3). BRR supplemented this loan with additional funding, also acquired on October 25, 1990, by Muro and Pat Rosselli (Rosselli's wife), who each borrowed $500,000.00 from Bank Leumi and subsequently advanced these sums to the corporation as Shareholder Loans. (Joint Pretrial Mem., Uncontested Facts ¶ 16). Despite this substantial injection of funds, by early 1991 it became increasingly difficult for BRR to continue paying Ferranti. (BRR's Proposed Findings of Fact ¶ 36). At the behest of Muro, who believed that Ferranti's prices were exorbitant anyway, (Tr. 3/18/96, at 118–19, 131), BRR hired Fiore to perform the general contracting duties for the remainder of the project. (Glenn Fiore Aff. Supp. Involuntary Pet. ¶ 2; BRR's Proposed Findings of Fact ¶ 36). Among its responsibilities, Fiore built retaining walls and laid the concrete for the paved yard. (Petitioning Creditors' Proposed Findings of Fact ¶ 10). Fiore eventually completed the construction in early 1992, and billed BRR $179,890.00 for its services. (*Id.* ¶¶ 11–12). Operations at the plant commenced sometime afterward in mid–1992. (Joint Pretrial Mem., Uncontested Facts ¶ 5).

Unfortunately, as happens all too often, the high hopes and expectations with which

---

**3.** The balances in the Shareholder Loan Accounts represent the total amount loaned by each individual shareholder. On the filing date, the balance of Muro's account was $832,000.00; the balance of Rosselli's account was $610,000.00; and the balance of Morris's account was $509,-000.00. (Joint Pretrial Mem., Uncontested Facts ¶ 17).

new ventures begin can easily give way to grimmer realities. Start-up costs exceeded those anticipated and combined with the technical and construction difficulties delayed and then limited operations, which hampered the corporation's profitability. (Tr. 3/18/96, at 129). Because the plant could not operate at full capacity, BRR remained relatively cash poor. Again, the corporation needed additional funding, and each Shareholder agreed to provide more money. But because Muro was having cash flow problems of his own at the time, he asked his son, Muro Jr., to contribute whatever amount that he could afford. This request·resulted in Muro Jr. drafting a check to BRR, dated March 18, 1992, in the amount of $22,500.00, with the notation "Loan–90 Days" written on its face. (Petitioning Creditors' Ex. 6). In addition to the cash contributions that the Shareholders would periodically make, BRR again obtained a loan from Bank Leumi, on July 1, 1993, in the amount of $280,000.00 ("Working Capital Loan"), which is evidenced by a promissory note that was due on September 1, 1993. (Petitioning Creditors' Ex. 4).

Throughout this time, Muro had become increasingly disenchanted with the direction the enterprise was taking under the management of Rosselli and Morris. Muro believed that he was constantly infusing money into BRR, while at the same time realizing no return on his Shareholder Loans, and thought that his company, Bay, should have been paid for the concrete it supplied during construction. (Petitioning Creditors' Proposed Findings of Fact ¶¶ 55–56). Exacerbating matters, Muro also believed that claimants with whom he has strong ties (the Petitioning Creditors) were denied payment by BRR, which instead chose to pay creditors like Ferranti, who were hired by Rosselli and Morris. (Tr. 3/18/96, at 131). A–One was not paid for $86,000.00 worth of concrete, no payments were made to lessen the $179,-890.00 that Fiore had billed, and Muro Jr. did not receive any repayment of his $22,-500.00 check. This overall pattern was perceived by Muro as a deliberate effort by Morris and Rosselli to use BRR for their own personal benefit, and/or their business associates' benefit, rather than treating him and the Petitioning Creditors fairly. Trust

between the Shareholders continued to deteriorate, and eventually the relationship soured to the point where it could not continue; some form of litigation was inevitable. Consequently, the involuntary Chapter 7 petition that constitutes the subject matter of this proceeding was filed on November 3, 1994.

The Petitioning Creditors contend that in addition to their claims—$179,890.00 by Fiore for general contracting services, (Glenn Fiore Aff. Supp. Involuntary Pet. ¶¶ 2, 4); $86,000.00 by A–One for concrete supplied, (Rocco Muro Aff. Supp. Involuntary Pet. ¶¶ 2, 4); and $22,500.00 by Muro Jr. for repayment of the short term loan, (Gerardo Muro Jr. Aff. Supp. Involuntary Pet. ¶ 2)— BRR had amassed other debts which were also due and unpaid as of the filing date. These debts are purported to include obligations totaling approximately $440,000.00 to Bay for concrete, (Petitioning Creditors' Proposed Findings of Fact ¶¶ 51, 56), $426,000.00 to Muro for a portion of his Shareholder Loans, (id. ¶¶ 47–48), $580,000.00 to Bank Leumi for the Term Note and Working Capital Loan, (id. ¶ 59; BRR's Proposed Findings of Fact ¶ 55), and $87,367.28 in trade debt, (Petitioning Creditors' Proposed Findings of Fact ¶ 63).

The claim regarding the Bank Leumi loans is based on an alleged default as of the filing date. Although BRR failed to repay both of the Bank Leumi loans when they initially came due (the Working Capital Loan on September 1, 1993 and the Term Note on October 31, 1993), extensions of both loans were worked out by an agreement dated August 17, 1994. (Joint Pretrial Mem., Uncontested Facts ¶ 15; Petitioning Creditors' Ex. 5). However, BRR failed to fully satisfy its obligations to Bank Leumi by the extended due date for the loans, October 1, 1994, (Petitioning Creditors' Proposed Findings of Fact ¶ 59), resulting in $580,000.00 of outstanding principal unpaid on the filing date, (BRR's Proposed Findings of Fact ¶ 55). Relatedly, the claim that payment was due on Muro's Shareholder Loans is based on an alleged breach of an oral agreement among the Shareholders respecting repayment of these loans. (Petitioning Creditors' Proposed

Findings of Fact ¶ 47). The agreement provided that Shareholder Loans would be repaid only after the Bank Leumi loans were satisfied in full, and that afterward those payments would be made only to the individual Shareholder with the highest outstanding balance in his Shareholder Loan Account, until reduced to equal the next highest balance. Two Shareholders would then start receiving payments, and so on. (BRR's Proposed Findings of Fact ¶ 63; Petitioning Creditors' Proposed Findings of Fact ¶ 43). As part of the extension agreement that BRR entered into on August 17, 1994, Bank Leumi required that payments to it begin on the $500,000.00 loan extended to Pat Rosselli, which sums were advanced to the corporation on behalf of her husband and reflected on BRR's books as a Shareholder Loan. The Petitioning Creditors argue that a breach occurred because of the payments on account of Rosselli's Shareholder Loans, which occurred prior to full repayment of the Bank Leumi loans. Furthermore, if any Shareholder deserved repayment, it should have been Muro, who had the highest outstanding balance in his Shareholder Loan Account. (BRR's Proposed Findings of Fact ¶ 62; Petitioning Creditors' Proposed Findings of Fact ¶ 47).

In its Answer to the involuntary petition, and its pre- and post-trial submissions, BRR does not dispute receipt of services, concrete, and money from the individual Petitioning Creditors. Instead, BRR characterizes this involuntary Chapter 7 proceeding as a mechanism impermissibly utilized by Muro for the sole purpose of resolving certain business disputes in his favor. According to Rosselli and Morris, at the initial organizational meeting in 1989, Muro had agreed to contribute between $4–5 million to BRR, an amount far in excess of what he actually provided. (BRR's Proposed Findings of Fact ¶ 69). This alleged agreement contemplated not only monetary contributions, but also included a commitment to provide concrete during construction of BRR's plant, in addition to allowing for various other non-monetary considerations, all of which would be recorded as Muro Shareholder Loans. (Id.). Rosselli and Morris contend that the claim of each Petitioning Creditor is in reality a contribu-

tion to BRR made at the request of Muro, and constitutes a Muro Shareholder Loan. Thus, Muro is responsible to each individual Petitioning Creditor for any repayment, not BRR. In fact, Rosselli and Morris claim that Fiore was hired with the understanding that Muro, and not BRR, would be responsible for paying Fiore's bills. (BRR's Proposed Findings of Fact ¶¶ 36, 43). In addition, BRR contends that Fiore's work was inferior, cost between $100,000.00 and $200,000.00 to repair, and is therefore subject to a bona fide dispute. (Id. ¶¶ 38–39). Muro Jr.'s check to BRR is purported to be merely another Shareholder Loan made on behalf of Muro by his son. (Id. ¶¶ 47, 50). Finally, it is argued that concrete delivered by A–One, on the occasions when Bay was unable to meet BRR's needs, should be treated as concrete delivered by Bay. (Id. ¶¶ 18–19, 33).

BRR also disputes the Petitioning Creditors' allegation that it was generally not paying its debts as they came due as of the filing date. With respect to the Term Note and Working Capital Loan, BRR states that it was negotiating with Bank Leumi both before and after the filing date for an extension of the due dates, and that these negotiations were continuous, requiring various commitments and periodic payments to Bank Leumi which were timely made. (Id. ¶¶ 56–58). Because of the continuous negotiations, periodic payments, and ultimate extension of the due date, BRR contends that it was not past due in its obligations to Bank Leumi on the filing date. (BRR's Proposed Conclusions of Law ¶ 32). With respect to Muro's Shareholder Loans, BRR disputes that any payment was due on the filing date, contending that there was no breach of the oral understanding between the Shareholders; alternatively, if there was such a breach, the consequences are not those urged by the Petitioning Creditors. BRR also argues that on the filing date it was current on its trade debt, and nearly all of the outstanding balances were carried in its normal course of business dealings.

## DISCUSSION

### I.

In resolving at least some aspects of the present dispute, Section 303(b) of the Bankruptcy Code governs, providing that

[a]n involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute ... if such claims aggregate at least $10,000.00....

11 U.S.C. § 303(b). Here, the claims alleged by the Petitioning Creditors easily exceed $10,000.00. The parties disagree, however, concerning whether each Petitioning Creditor has the standing necessary to file the involuntary petition.[4] The focus of this dispute centers on: 1) whether the Petitioning Creditors' claims are properly lodged against BRR, rather than actually constituting claims against Muro; and 2) if BRR is determined to be the party responsible for payment of these claims, whether Fiore's claim is subject to a bona fide dispute. The burden of proof respecting these issues rests on the Petitioning Creditors. *See In re Better Care, Ltd.,* 97 B.R. 405, 418 (Bankr.N.D.Ill.1989) (holding that "the burden is upon the petitioning creditors to prove ... [t]hat they constitute a sufficient number of creditors holding claims [against the debtor] ... [and t]hat their claims are not contingent as to liability or the subject of a bona fide dispute"); *Subway Equip. Leasing Corp. v. Sims (In re Sims),* 994 F.2d 210, 221 (5th Cir.1993); *In re Reid,* 773 F.2d 945, 946 (7th Cir.1985); *2 Collier on Bankruptcy* ¶ 303.03[2][b][ii], at 303–24 (Lawrence P. King, ed., 15th ed. rev.1997).

4. The Bankruptcy Code permits the filing of an involuntary petition by fewer than three petitioning creditors, when the total number of entities holding claims against the alleged debtor is less than twelve. *See* 11 U.S.C. § 303(b)(2). While it appears from the testimony and evidence that BRR has more than twelve creditors, no list of creditors was specifically presented on this point. *Cf.* Fed. R. Bankr.P. 1003(b) (providing that "[i]f the answer to an involuntary petition filed by fewer than three creditors avers the existence of 12 or more creditors, the debtor shall file with the answer a list of all creditors").

Although the parties have agreed that disqualification of any one of the three Petitioning Creditors mandates dismissal of the case, the assumption is that Muro's status as a shareholder of BRR precludes Bay's or his joining in the petition. (Joint Pretrial Mem., Petitioning Creditors'

■ Glenn Fiore attempted to meet his company's burden at trial, testifying that Fiore's contracting services were performed with the understanding that payment would commence after recycling operations began, (Tr. 3/14/96, at 47–48), and that he expected payment from BRR, not Muro, (*id.*). More compelling is the documentary evidence, which was admitted at trial without objection, that clearly supports these contentions. There is no argument that the sums Fiore alleges as overdue are well documented in BRR's financial records. In fact, for the year ending December 31, 1992, nearly two years prior to the filing date, BRR's "Accounts Payable" schedule [5] reflects a liability that equals the sum claimed by Fiore. (Petitioning Creditors' Ex. 17, at 3). According to their own accountant, Michael Ehrenpreis, BRR's financial statements for the calendar years ending 1992, 1993, and 1994, (Petitioning Creditors' Exs. 11–13), include this liability as well. Moreover, Ehrenpreis testified that the statements were prepared by himself, or his predecessor accountant, based on information provided by BRR, which included consultations with Rosselli and Morris. (Tr. 4/16/97, at 36, 55–57).

The rebuttal to Glenn Fiore's testimony, and the supporting documentary evidence, consists almost entirely of unsupported allegations by Rosselli and Morris. They testified that Muro, on behalf of BRR, agreed to pay Fiore for services and have that payment reflected in his Shareholder Loan Account. (Tr. 3/5/97, at 32; Tr. 4/2/97, at 40–41). As the story goes, Fiore would work for BRR

Statement of Disputed Facts ¶ 33). This may not necessarily be the case, *see 2 Collier on Bankruptcy* ¶ 303.03[2][c][vi], at 303–27 (Lawrence P. King, ed., 15th ed. rev.1997). However, no determination of this question need be addressed in light of the Court's holdings in this contested involuntary bankruptcy case.

5. The Accounts Payable schedule is a handwritten document prepared by Pat Rosselli, who served for a time as BRR's bookkeeper. It was provided to John Sheridan, the Petitioning Creditors' forensic accountant, during the course of his investigation of BRR's affairs in connection with this proceeding. (Tr. 1/17/97, at 34–35). The schedule was admitted into evidence without objection and is uncontroverted. (*Id.* at 36).

without pay to offset a preexisting indebtedness to Muro, with Fiore receiving payment from Muro only for sums earned in excess of that indebtedness. (BRR's Proposed Findings of Fact ¶¶ 36, 43). Muro would later be compensated for any outlays to Fiore under the same terms and conditions of the Shareholder Loans. Other than the self-serving testimony of Rosselli and Morris, however, these allegations are supported only by evidence of payments by Muro to Fiore totaling $47,700.00. (BRR's Ex. 1). We find this demonstration unconvincing. As stated previously, the $179,890.00 claim is specifically recorded on BRR's books and records as a liability to Fiore for his contracting services. It is not included in the balance of the Muro Shareholder Loan Account, as one should reasonably expect if BRR's contentions are to be accepted. Muro and Glenn Fiore both testified that the $47,700.00 of payments in question were made to ensure Fiore's continued service, and not as part of any independent obligation of Muro to pay for Fiore's contracting work. (Tr. 3/14/96, at 72–74; Tr. 9/20/96, at 42–43).

 We further find, contrary to BRR's contentions in this regard, that Fiore's claim is not subject to a bona fide dispute. The requirement that claims be free from such disputes was added to § 303(b) by the Bankruptcy Amendments and Federal Judgeship Act of 1984. *See* Pub.L. No. 98–353, 98 Stat. 333, 392 (1984); *see also In re Braten*, 86 B.R. 340, 342 (Bankr.S.D.N.Y.1988); *In re B.B.S.I., Ltd.*, 81 B.R. 227, 230 (Bankr. E.D.N.Y.1988). Although the term "bona fide dispute" is not explicitly defined by Congress, when assessing a claim, most courts follow the standard set forth by the Seventh Circuit:

> [T]he bankruptcy court must determine whether there is an objective basis for either a factual or legal dispute as to the validity of debt. However, "[t]he statute does not require the court to determine the outcome of any dispute, only its pres-

ence or absence. Only a limited analysis of the claims at issue is necessary."

*In re Busick*, 831 F.2d 745, 750 (7th Cir.1987) (second alteration in original) (quoting *In re Busick*, 65 B.R. 630, 637 (N.D.Ind.1986)); *accord Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir.1991); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543 (10th Cir.1988); *In re Megatrend Telecommunications, Inc.*, 193 B.R. 122, 125 (Bankr.D.Conn.1996); *In re Mavellia*, 149 B.R. 301, 305–06 (Bankr.E.D.N.Y.1991); *In re Braten*, 86 B.R. at 343; *In re B.B.S.I.*, 81 B.R. at 230.

 Initially, there can be no question that BRR's liability to Fiore is without condition. The documentary evidence to this effect is virtually conclusive and shifts the burden of demonstrating the existence of a bona fide dispute to BRR. *See In re Rimell*, 946 F.2d at 1365; *In re Elsa Designs, Ltd.*, 155 B.R. 859, 864 (Bankr.S.D.N.Y.1993). BRR attempts to satisfy this burden by casting aspersions of substandard workmanship, which allegedly cost between $100,000.00 and $200,000.00 to repair, supported solely by the testimony of Rosselli and Morris. (Tr. 3/13/97, at 42; Tr. 4/2/97, at 37–38). No documentary evidence, in the form of bills, receipts, etc., was produced at trial to support the allegations of a costly repair. BRR's books and records also fail to reference any dispute. We conclude from this dearth of evidence that there is no basis for this Court to determine that there is a bona fide dispute to Fiore's claim which would preclude its eligibility as an involuntary petitioner.

 Muro Jr.'s claim against BRR, like Fiore's, is similarly well documented. The amount of Muro Jr.'s check is reflected on BRR's financial statements for the years ending 1992, 1993, and 1994 as a loan payable to Muro Jr. in the amount of $22,500.00.[6] (Petitioning Creditors' Exs. 11–13). Furthermore, financial statements for the years ending 1993 and 1994 specifically state that

---

**6.** The 1992 financial statement refers to a $22,500.00 "loan payable-other," (Petitioning Creditors' Ex. 11, at 2), while the 1993 and 1994 financial statements refer to a "loan payable-related party," (Petitioning Creditors' Ex. 12, at

2; Ex. 13, at 2). Ehrenpreis testified that the other/related party was Muro Jr., and that the entry reflects the Muro Jr. check. (Trial Tr. (April 16, 1997) at 59–60).

repayment of the check was presently due and owing. (Petitioning Creditors' Ex. 12, at 7; Ex. 13, at 7). Indeed, even more revealing is the fact that BRR initially admitted that it was liable to Muro Jr. for the check in its Answer to the involuntary petition, disputing only that repayment of the check was due as of the filing date. (Answer ¶ 9). It was not until submission of the pretrial memorandum that BRR first stated that the check "was part of the **capital contribution** that Muro Sr. obligated himself to make to [BRR]," and accordingly "there was no obligation on the part of [BRR] to repay the loan." (Joint Pretrial Mem., BRR's Statement of Disputed Facts ¶ 26) (emphasis added). At trial, BRR then tried to show that the check was submitted in accordance with a nebulous arrangement between Muro and Rosselli whereby Bay (owned by Muro) would pay certain sums to Parkway Recycling Corp. (owned by Rosselli), Parkway or Rosselli would next loan those monies to BRR, and finally BRR would then repay the Muro Jr. check. (BRR's Proposed Findings of Fact ¶ 48). Again, no documentary evidence was submitted in support of BRR's contentions. Other than the testimony of Rosselli and Morris, there is no basis to discount the documentary evidence submitted in support of Muro Jr.'s claim,[7] and accordingly, we conclude that Muro Jr.'s claim was due and unpaid on the filing date.

■ Unlike the claims of the other Petitioning Creditors, there is no "smoking gun" evidencing a debt owed to A–One appearing on BRR's financial statements. Yet, it is undisputed that A–One delivered concrete valued at approximately $86,000.00 that was used in the construction of BRR's recycling plant. Contrary to Rocco Muro's testimony, that he agreed to supply concrete only when Bay was unable and, like Fiore, to suspend payment until the commencement of BRR's recycling operations, (Tr. 3/18/96, at 47–48), BRR contends that A–One was in effect supplying concrete for Bay, and that Bay or Muro is responsible for any payments due. This defense rests on BRR's allegation that Muro agreed to supply concrete to the cor-

poration on the same terms as his Shareholder Loans. (BRR's Proposed Findings of Fact ¶ 18). The parties agree that Bay was the primary source of concrete; A–One supplied concrete only when Bay was unable to meet occasional increases in demand. (*Id.* ¶ 19; Tr. 3/18/96, at 104). According to BRR, A–One's deliveries merely helped Bay meet its preexisting obligations, and are similar to practices that typically occur in the concrete industry. (BRR's Proposed Findings of Fact ¶ 24). BRR argues that this "industry practice" dictates that A–One may only look to Bay for repayment, necessitating the conclusion that BRR's obligation for concrete runs only to Bay. (BRR's Proposed Conclusions of Law ¶ 11). The Court accepts Morris's testimony that it is standard industry practice for concrete suppliers, which are primarily responsible for concrete delivery, to call on outside companies when necessary to fulfill existing commitments. The outside companies then seek payment only from the primary suppliers, and not the ultimate purchasers. (Tr. 3/5/97, at 18–20). Nevertheless, the situation presented here was far from typical or standard, and industry practice, relied on so heavily by BRR in support of its defense to A–One's claim, is not dispositive.

Although Rocco Muro, on cross-examination, substantially confirmed this industry practice, (Tr. 3/18/96, at 63–71), the present situation was not the arms length, sub-contracting relationship that typically occurs. Rocco Muro had significant contact with BRR both before and after his company began delivering concrete, giving rise to a relationship between A–One and BRR independent of Bay. This relationship began early in BRR's development when Rocco Muro was given an opportunity to purchase a 25% ownership interest in the corporation at a meeting with his brother, Morris, and Rosselli, but declined the offer. (*Id.* at 24–25). In addition, both Rosselli and Morris were skeptical of Bay's ability to satisfy all of the demand for concrete; in fact, BRR acknowledged that prior to construction

7. This Court finds inconclusive the fortuitous presence of an unsupported entry for a March 1992 Muro Shareholder Loan, in the same amount as the Muro Jr. check, on a schedule of Shareholder Loans compiled by the Petitioning Creditors. (Petitioning Creditors' Ex. 23).

there was an awareness that concrete would be supplied by A–One. (BRR's Proposed Findings of Fact ¶ 19). Moreover, according to Rocco Muro, in at least one instance concrete was ordered directly from A–One (rather than placing the order with Bay and having Bay contact A–One) by Fiore in its capacity as BRR's contractor. (Tr. 3/18/96, at 84–85).[8] One last consideration is that nearly all of A–One's invoices, the internal documents by which A–One kept record of how much concrete was supplied and whom to bill, referenced BRR as the party responsible for payment, either solely or jointly with Bay. (Petitioning Creditors' Exs. 8–9). These invoices were supported by corresponding delivery tickets, with copies left at BRR's property when delivery was made. All of the delivery tickets had 1991 and 1992 dates, contemporaneous with the actual BRR deliveries. The invoices and delivery tickets were admitted into evidence without objection and are uncontroverted. (Tr. 3/18/96, at 45–46, 51–52). Clearly, the contention that BRR has no liability to A–One for concrete that was received and used defies logic and fairness. At the very least, BRR and Bay jointly share in the responsibility for payment of concrete supplied by A–One, thus allowing A–One to seek any monies owing from either BRR or Bay. It is this Court's opinion, therefore, that BRR's debt to A–One, which was due prior to the filing date, properly serves as a claim under section 303(b) and confers standing on A–One as a Petitioning Creditor. *See In re Elsub Corp.*, 66 B.R. 172, 187 (Bankr.D.N.J. 1986) (holding obligation of alleged debtor for which another entity was jointly liable may serve as basis of a petitioning creditor's claim under section 303(b)); *see also First City Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047 (5th Cir.1992); *In re Lloyd McKee Motors, Inc.*, 157 B.R. 484 (Bankr.D.N.M.1993).

## II.

Having determined that the Petitioning Creditors each hold claims against BRR

which were due and unpaid as of the filing date, we must now address whether an order for relief against BRR should be entered. The operative statutory provision, in pertinent part, provides that "the court shall order relief against the debtor in an involuntary case ... only if (1) the debtor is **generally not paying such debtor's debts as such debts become due** unless such debts are the subject of a bona fide dispute...." 11 U.S.C. § 303(h)(1) (emphasis added).

Courts are not strictly constrained when applying § 303(h)(1), due in large part because the term "generally not paying" has been left undefined and the corresponding legislative history is meager. *See B.D. Int'l Discount Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Discount Corp.)*, 701 F.2d 1071, 1075 (2d Cir.1983). Such vagueness is properly interpreted as providing courts with wide latitude in determining whether an entity fails the "generally not paying" test, thereby enabling creditors an opportunity to utilize the drastic step of forcing that entity into bankruptcy. *See, e.g., Hayes v. Rewald (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 779 F.2d 471, 475 (9th Cir.1985) ("The authority of the court is triggered and guided by the totality of the circumstances existing when the petition is filed. Congress intended to provide a flexibility which is not reducible to a simplistic formula."). Nevertheless, we are aided in our analysis " 'by the gradual approach and contact of decisions' " that address whether alleged debtors are generally not paying their debts. *In re B.D. Int'l Discount Corp.*, 701 F.2d at 1077 (quoting *Noble State Bank v. Haskell*, 219 U.S. 104, 112, 31 S.Ct. 186, 188, 55 L.Ed. 112 (1911) (Holmes, J.)). In assessing the instant involuntary petition, this Court's consideration includes an evaluation of such factors as the number of claims against BRR and their amount, the materiality of any nonpayments in the context of BRR's overall financial picture, and BRR's conduct of its financial affairs. *See In re Concrete Pumping Serv., Inc.*, 943 F.2d 627,

**8.** BRR's representation that Fiore was never instructed to order concrete from A–One is irrelevant. (BRR's Proposed Findings of Fact ¶ 23). It is undisputed that Fiore acted in its capacity as contractor for BRR, and BRR fails to allege that Fiore was specifically instructed **not** to order from A–One. (Id.).

630 (6th Cir.1991); *Crown Heights Jewish Community Council v. Fischer (In re Fischer)*, 202 B.R. 341, 351 (E.D.N.Y.1996); *Boston Beverage Corp. v. Turner*, 81 B.R. 738, 742 (D.Mass.1987); *In re Arriola Energy Corp.*, 74 B.R. 784, 790 (S.D.Tex.1987); *In re Tikijian*, 76 B.R. 304, 321 (Bankr.S.D.N.Y. 1987). Still, a final determination is guided by " 'no hard and fast rules,' " *In re Fischer*, 202 B.R. at 350 quoting *In re Einhorn*, 59 B.R. 179, 185 (Bankr.E.D.N.Y.1986), and has been aptly described as the result of a "rough calculus." *In re Palace Oriental Rugs, Inc.*, 193 B.R. 126, 129 (Bankr.D.Conn. 1996). The burden of proving that BRR was generally not paying its debts as they came due rests on the Petitioning Creditors. *See 2 Collier on Bankruptcy* ¶ 303.14[1][e], at 303-83. Certainly, one consideration in our calculus is that BRR's debts to the three Petitioning Creditors were due and unpaid on the filing date and totaled approximately $288,-000.00.

Another consideration is that BRR's indebtedness to Bay is an obligation which was also due and unpaid on the filing date. The parties agree that Bay delivered concrete valued at approximately $440,000.00, which was used in construction of BRR's facilities. (BRR's Proposed Findings of Fact ¶ 67; Petitioning Creditors' Proposed Findings of Fact ¶ 51). The Petitioning Creditors contend that Muro agreed to supply BRR with concrete and wait for repayment until construction was completed and operations commenced. (Petitioning Creditors' Proposed Findings of Fact ¶ 50). These repayment terms are supported by the testimony of Muro, (Tr. 3/18/96, at 101), and are entirely consistent with the testimony given by Glenn Fiore, (Tr. 3/14/96, at 47–48), and Rocco Muro, (Tr. 3/18/96, at 43), respecting their own arrangements with BRR. Similar to its arguments against the claims of A–One and Fiore, BRR contends that concrete supplied by Bay was actually a Muro Shareholder Loan. Accordingly, repayment was not due on the filing date. (BRR's Proposed Conclu-

sions of Law ¶¶ 33–34). However, the evidence, including documentary evidence gleaned from BRR's books and records, again belies BRR's assertions.

It is undisputed that $104,000.00 worth of concrete delivered by Bay is recorded as a liability in BRR's books and records. (BRR's Proposed Findings of Fact ¶ 67; Petitioning Creditors' Proposed Findings of Fact ¶¶ 51–52). According to Ehrenpreis, this liability is reflected in BRR's financial statements for the years ending 1992, 1993, and 1994, (Petitioning Creditors' Exs. 11–13), as an "Accounts Payable Shareholder," a separate and distinct account from entries reflecting BRR's liability to Muro for Shareholder Loans. (Tr. 4/16/97, at 74–75). Moreover, the Shareholder Loan Accounts are listed on the financial statements with the notation that repayment is subordinated to repayment of the Bank Leumi loans. (Petitioning Creditors' Ex. 11, at 2, 6; Ex. 12, at 2, 7; Ex. 13, at 2, 7). This comports with the oral agreement to that effect between the Shareholders. In stark contrast, the Accounts Payable Shareholder entry has no such notation, clearly demonstrating that BRR chose to record and consider the debt to Bay as anything but a Shareholder Loan.

Although explanations were presented regarding why the total cost for the concrete supplied by Bay does not appear on BRR's books, no party has suggested that the terms for repayment of the unrecorded portion differs in any respect from the terms for the portion which was recorded. The documentary evidence clearly contradicts BRR's contentions that this was a Muro Shareholder Loan. Instead, it supports the testimony of Muro, who stated that BRR agreed to pay Bay after construction was completed and operations commenced. Accordingly, we find that the debt to Bay, totaling approximately $440,000.00, became due well before the filing date.[9]

The Petitioning Creditors also contend that the corporation's obligations to

---

**9.** The parties agree that construction of the plant was fully completed sometime between late 1991 and the middle of 1992. Although Muro testified that he agreed to defer repayment for several months, (Tr. 3/18/96, at 129–30), there is no

indication that this deferment was ever intended to be perpetual. The monies were owing and should have been paid by the filing date, over two and one half years later.

Bank Leumi, for the unpaid amount of the Term Note and Working Capital Loan, should weigh in favor of a determination that BRR was generally not paying its debts as they became due. Prior to the filing date, BRR incurred two separate obligations to Bank Leumi totaling over $1 million. The Term Note, in the amount of $750,000.00, was executed on or about October 25, 1990 and was scheduled to be repaid in full by October 31, 1993. It required graduating monthly payments in the amount of $15,-000.00 plus interest beginning on the last day of May 1991, $25,000.00 plus interest beginning on the last day of November 1991, and $30,000.00 plus interest beginning on the last day of November 1992, continuing thereafter until paid in full. (Petitioning Creditors' Ex. 3, at 1). The Working Capital Loan, in the amount of $280,000.00, was entered into July 1, 1993 and required no monthly payments against the principal, simply one balloon payment for the entire amount on September 1, 1993. (Petitioning Creditors' Ex. 4).

On September 1, 1993, BRR failed to make the balloon payment required on the Working Capital Loan, and on October 31, 1993, failed to repay the Term Note as well. However, the due date for both loans was collectively extended to October 1, 1994 by a single agreement between BRR and Bank Leumi, entered into on August 17, 1994 ("Extension Agreement"). (Petitioning Creditors' Ex. 5). The Extension Agreement required no payment toward the Working Capital Loan until the extended due date and required only one payment of $15,000.00, due September 1, 1994, in reduction of the Term Note, (*id.* at 3), which at that time had an outstanding balance of $290,000.00, (*id.* at 1). The remainder was payable in full on October 1, 1994, along with repayment of the $280,-000.00 Working Capital Loan. (*Id.* at 1, 3). As consideration for the extension, BRR gave additional security, with all three Shareholders, including Muro, providing additional personal guarantees. (*Id.* at 1, 2).

We are aware of no action taken by Bank Leumi to enforce the Term Note or Working Capital Loan during the eleven month period between September/October of 1993, when the loans first became due, and August 17, 1994, the date of the Extension Agreement. Presumably, much of this period was used for negotiating the agreement, which was ultimately embodied by a complex contract, seventeen pages in length. The closing of the Extension Agreement also seems to have been delayed by the festering dispute between the Shareholders.[10] Regardless, it appears that BRR ultimately complied with all of the conditional terms of the Extension Agreement, but again failed to make payment in full when the extended due date arose on October 1, 1994. As a result, BRR once again entered negotiations seeking further extension of the loans, and once again Bank Leumi took no action to enforce the obligations. Eventually, the loans were extended a second time by agreement entered into sometime later in 1995. It was during this window, between the extended due date of October 1, 1994 and the second extension in 1995, that the involuntary petition was filed.

The Petitioning Creditors assert that on the filing date, BRR was in default on both loans. (Petitioning Creditors' Proposed Findings of Fact ¶¶ 59–60). The evidence chiefly relied upon in support of this assertion is a letter written to the Shareholders by counsel to Bank Leumi which appears to recognize that the loans were in default. (*Id.* ¶ 60; Petitioning Creditors' Ex. 30). According to the Petitioning Creditors, any subsequent agreement cannot, as a matter of law, alter the reality that BRR's obligations to Bank Leumi were due and unpaid on the filing date. *See In re Win–Sum Sports, Inc.,* 14 B.R. 389, 392 (Bankr.D.Conn.1981) ("[P]ost-petition payments ordinarily indicate a last ditch effort on the part of the alleged debtor to avoid bankruptcy proceedings."); *see also In re Better Care,* 97 B.R. at 408; *In*

---

**10.** By letter dated June 23, 1994, Bank Leumi expressed its displeasure over repeated adjournments of the closing of the Extension Agreement. (Petitioning Creditors' Ex. 30). This letter was sent to the Shareholders and others, including Gary Kushner, Esq ., counsel for the Petitioning Creditors herein. According to Bank Leumi, the last adjournment was requested by "Mr. Gary Kushner, counsel to Gerardo Muro." (*Id.* at 2).

*re Midwest Processing Co.,* 41 B.R. 90, 98 (Bankr.D.N.D.1984). We disagree.

■ First, the letter relied on so heavily by the Petitioning Creditors is dated June 23, 1994, only two months prior to the signing of the Extension Agreement on August 17, 1994. (Petitioning Creditors' Ex. 30). In any event, the letter, which ostensibly attests to BRR's default on the Term Note and Working Capital Loan as of the filing date on November 3, 1994, has no relevance to any such alleged default. Technically, if any default occurred at all, it would have occurred under the terms of the Extension Agreement, which was entered into after the letter was written and essentially constituted a new contract between BRR and Bank Leumi, reformulating their respective obligations. Second, contrary to the assertion of the Petitioning Creditors, this Court may consider the pre- and post-filing date negotiations between the parties, including the eventual work-out of the Term Note and Working Capital Loan. *See In re Win–Sum Sports,* 14 B.R. at 392 ("[P]ost-petition payments in delinquent accounts **may** be material in some circumstances to the issue of whether relief should be granted under § 303(h)(1)....") (emphasis added).

The involuntary petition, admittedly orchestrated by Muro, was filed one month after the extended due date elapsed, but before agreeable terms for a new extension could be reached, and came at a time when all the Shareholders could have reasonably expected a further extension. As discussed above, Bank Leumi had previously refrained from defaulting both loans for nearly one year, during the negotiation of the Extension Agreement. It is highly likely that Muro had familiarity with those negotiations, and the Shareholders, including Muro, had every reason to believe that when the due date of October 1, 1994 passed Bank Leumi would again grant an extension pending further negotiations. The Shareholders were also undoubtedly aware that hammering out any new extension would require additional time. Indeed, Bank Leumi took no legal action to default the loans after the due date passed and never joined the involuntary proceeding as a petitioning creditor. Instead, the bank

granted a further extension sometime in 1995, after the filing date, according to Bilha Friedenberg, a Vice President of Bank Leumi. (Tr. 3/14/96, at 113). Moreover, there has been no subsequent default and BRR maintained itself current in its obligations under the 1995 agreement. (*Id.*). Based on the course of dealings between BRR and Bank Leumi, the existence of negotiations, and the timing of the involuntary petition filing, we find that BRR's obligations to Bank Leumi were not overdue as of the filing date. Thus, the posture of these obligations weigh against a determination that BRR was generally not paying its debts within the meaning of § 303(h)(1).

■ Similarly, the Petitioning Creditors have failed to prove their contention that BRR's obligation to repay a portion of Muro's Shareholder Loans was due and unpaid on the filing date. This contention is based on the fact that BRR repaid a portion of Rosselli's Shareholder Loans in apparent violation of the oral understanding that **no** Shareholder Loans were to be repaid until repayment **in full** of the outstanding Bank Leumi loans. Recognizing that the Term Note and the Working Capital Loan were not extinguished prior to payments made toward Rosselli's Shareholder Loans, the Petitioning Creditors argue that these payments were improper and rendered a portion of Muro's Shareholder Loans totaling $426,000.00 immediately due and payable. This contention is unsupported by any credible evidence adduced at trial and is inapposite. Clearly, the terms of the oral understanding did not encompass the consequences that would flow from any breach. There was no evidence introduced to demonstrate that this remedy was ever contemplated by the Shareholders, nor was there a basis presented which warrants this Court's acceptance of the Petitioning Creditors' choice of remedy. Indeed, Bank Leumi still has not been fully repaid, and remedying any alleged improper payments towards the Rosselli Shareholder Loans with, essentially, what can be construed as additional improper payments toward the Muro Shareholder Loans, strikes

this Court as decidedly inappropriate.[11] Regardless, the Petitioning Creditors have failed to establish that Muro's Shareholder Loans were due and payable, and therefore cannot be weighed in favor of a determination that BRR, on the filing date, was generally not paying its debts as they came due.

Finally, the Petitioning Creditors' demonstration respecting BRR's trade debt is also unconvincing. The parties agree that BRR's obligations to its several dozen trade creditors on the filing date totaled approximately $133,000.00, (BRR's Proposed Findings of Fact ¶ 71; Petitioning Creditors' Proposed Findings of Fact ¶ 63), $87,000.00 of which the Petitioning Creditors contend was past due. (Petitioning Creditors' Proposed Findings of Fact ¶ 63). In support, the Petitioning Creditors rely on a computer printout generated by BRR which sets forth the corporation's "Accounts Payable Aging" as of the filing date. (Petitioning Creditors' Ex. 27; BRR's Ex. 2). The meaning of this document and the extent of the Petitioning Creditors' analysis in this regard was recounted at trial by their forensic accountant John Sheridan. He testified that BRR typically repaid trade debt within thirty days of billing, and that the Accounts Payable Aging schedule indicated that certain trade debt was outstanding for more than thirty days. (Tr. 2/19/97, at 67–68). Based upon that computer printout, Petitioning Creditors mechanistically conclude that BRR was not current on some $87,000.00 in trade debt for purposes of § 303(h)(1). No independent investigation of the status of BRR's obligations to these trade creditors was ever conducted by Mr. Sheridan or any other representative of the Petitioning Creditors. In fact, two of these "overdue" creditors were BRR's present and predecessor accounting firms, which were owed approximately $28,000.00, yet declined to join the proceeding as a petitioning creditor. (BRR's Ex. 2). Ehrenpreis, affiliated with both accounting firms, attended all ten days of trial and even testified on BRR's behalf. Another of the allegedly overdue creditors was Parkway Recycling Corp. Although it was owed $5,000.00, it chose not to join the involuntary petition, due in large part because it is owned, ironically, by Rosselli. Nor did any of the remaining trade creditors choose to join this proceeding as a petitioning creditor. In fact, Morris more than adequately explained at trial the reasons for the presence of any outstanding trade debt beyond thirty days and that such obligations were not in default. (Tr. 3/5/97, at 37–57). We find that BRR was not overdue for any trade debt on the filing date for purposes of § 303(h)(1). Thus, the posture of this debt also weighs against a determination that BRR was generally not paying its debts as they became due.

### CONCLUSION

Dismissal of this involuntary chapter 7 proceeding is warranted. Although filed by the requisite number of creditors under 11 U.S.C. § 303(b)(1), the Petitioning Creditors have failed to demonstrate that BRR was generally not paying its debts as they came due under 11 U.S.C. § 303(h)(1). BRR's due and unpaid debts were comprised entirely of the claims of the three Petitioning Creditors, totaling approximately $288,000.00, and the claim of Bay, totaling approximately $440,000.00. These sums, while significant, are far outweighed in number and amount by the remaining debts of BRR, all of which were current or not yet due. BRR was not past due in its obligations to Bank Leumi totaling over $1 million. Repayment to the three Shareholders, on Shareholder Loans totaling almost $2 million, were not due as of the filing date. BRR was current in its obligations to over three dozen trade creditors with amounts totaling approximately $133,000.00. Interestingly, no other entity joined this proceeding as petitioning creditor even though the litigation was quite protracted.

The corpus of BRR's unpaid debts are owed to Bay, which is owned by Muro, and the Petitioning Creditors: Muro's son, brother, and business associate. In determining whether the Petitioning Creditors have met their burden of proving that BRR

---

11. Although the Court refuses to conclusively fashion a resolution to the parties' dispute in this regard, at least one alternative, BRR's recoupment of the payments if they are actually determined to be improper, seems much more sensible.

was generally not paying its debts as they came due, this Court "should examine the totality of the circumstances, balancing the interests of the [alleged] debtor with those of the creditors." *Bartmann v. Maverick Tube Corp.*, 853 F.2d at 1546. Involuntary bankruptcy is an extreme remedy with dire consequences upon a business enterprise. Such a remedy exists as an avenue of relief for the benefit of the overall creditor body of troubled businesses. Involuntary bankruptcy was not intended to redress the special grievances, no matter how legitimate, of particular creditors of a business otherwise holding its own. Muro and the Petitioning Creditors must seek redress under state law, in the state courts and not in the bankruptcy court.

Accordingly, the involuntary petition filed against Brooklyn Resource Recovery, Inc. shall be dismissed. BRR's counterclaim for costs and sanctions under 11 U.S.C. § 303(i) is also dismissed.